# BAILEY'S BAKERY, LTD. *v.* WILLIAM BORTHWICK, TAX COMMISSIONER OF THE TERRITORY OF HAWAII.

## No. 2639.

Argued October 30, 31, 1947.  Decided February 19, 1948.

Kemp, C. J., Peters and Le Baron, JJ.

OPINION OF THE COURT BY PETERS, J.

This is an action brought pursuant to the provisions of Revised Laws of Hawaii 1945, section 1575, by an employing unit to recover unemployment contributions assessed against it under the Hawaii unemployment compensation law and paid by it under protest. The contributions assessed cover the period from January 1, 1937 to September 30, 1944, and have relation to contributions required to be made into the territorial unemployment compensation fund by employing units having individuals in their employ.

The plaintiff is a corporation organized and existing under the laws of the Territory with its principal place of business in Honolulu. It will be referred to hereinafter as the "bakery." It is engaged in the business of manufacturing at its own plant in Honolulu and selling at wholesale bread and other bakery products. Prior to 1935, when the delivery system which gave rise to the present controversy was inaugurated, all its customers were retailers. The bakery did not sell to consumers and sales by the bakery included the obligation on its part to deliver to the purchaser the product sold. Deliveries had been made previously by it with its own equipment, consisting of six delivery trucks which were operated by drivers who worked for the bakery for stated hours and wages. The delivery system inaugurated in 1935 was the outgrowth of the pre-existing system. No express contract between the bakery and the drivers, either written or oral, marked the inauguration of the new system. Contrary to the findings by the trial court that "it [bakery] entered into oral contracts with drivers who owned and operated their own trucks to sell to these drivers a daily supply of bread * * *" the bakery issued its ukase stating the conditions upon which deliveries would thereafter be made and the drivers had no option

18

but to accept it or quit. Whatever is known of their contractual relations upon the inauguration of the new system and their subsequent contractual relations as the system developed is deducible only from what was done by the parties in the performance of their bilateral obligations. But there is no evidence to sustain the finding that oral contracts were entered into, one of the terms of which was the "sale" of bread to the drivers. The proposition as originally presented by the bakery to the drivers was that the bakery would cease to furnish delivery equipment and all drivers would thereafter be required to furnish and maintain their own delivery equipment and pay the cost of operating the same; that the bakery would sell its present equipment to such of the drivers who might desire to purchase the same and where necessary it would itself finance purchases; that stated wages and hours of labor would be discontinued; that the drivers would be required to make deliveries daily to the bakery's present customers and to such additional retailers as might desire its products for retail sale; that the drivers would also be required to collect from the retailer the wholesale price of bread for each loaf of bread delivered, except in cases of certain stores, restaurants and public institutions to which the bakery personally extended credit, from which the driver would be entitled to retain the difference between the wholesale price and the price fixed by the bakery to the driver at the plant, amounting in the case of bread to eight mills per loaf. Delivery slips to credit customers were accepted by the bakery from the drivers as cash at the rate of eight mills for each loaf delivered. There is no evidence as to what the driver was entitled to retain from the wholesale price of bakery products other than bread.

Obviously, the bakery exercised no control over the equipment furnished by the driver or the manner of its

operation, but it exercised complete control over deliveries. The retailers supplied by the bakery were scattered over the city of Honolulu and vicinity. The bakery divided the urban and suburban areas containing the retailers purchasing its products into districts or routes and assigned a driver to each route. No competition existed between drivers and they were confined to the districts or routes to which they were assigned. All bread delivered was sealed at the bakery's plant in a wrapper bearing the name of the bakery and the trade name applied by it to the particular type of bread enclosed therein. Sales slips bearing the name of the bakery and the bakery products to be delivered accompanied all deliveries. All prices were arbitrarily fixed by the bakery, *viz.,* the price charged against drivers at the plant, the wholesale price to retailers and even the retail price to be charged by the retailer. These prices in course of time were changed by the bakery. The differential that the drivers were entitled to receive was the amount which the bakery allowed to them, they having no part in the determination of the rates for the delivery service performed by them and upon which their remuneration was computed. All settlements between the bakery and the drivers were made after and not before deliveries and as far as the record discloses the price of bread to drivers at the plant was never paid by the drivers when the bread was taken from the plant for delivery. The bakery, with the exception heretofore noted, required that cash be collected by the driver upon delivery and any credit extended by the driver was upon his own responsibility. Unsold bread was returnable to the bakery on the basis of the price at the plant to the driver and the quantity of bread to be delivered to each retailer was subject to limitation by the bakery. The drivers from time to time met with the management of the bakery at the latter's instance upon details of the delivery system. The bakery

solicited new business and that secured independently by it was assigned to the driver of the appropriate district or route. The drivers also solicited and secured new business within the district to which they were assigned. Agents of the bakery upon occasion rode with the drivers to learn their routes and sometimes supplied relief drivers. In 1936 and 1937 the bakery paid bonuses to its drivers based upon service and annual income. In one instance a driver was secured by the bakery from a local employment office.

The drivers did not hold themselves out to the public as engaged in a delivery service. There is nothing to show that they were public carriers of goods. Upon occasion they did make deliveries for persons other than the bakery but this was done mainly in conjunction with their deliveries of the bakery's products. When not engaged in making deliveries of the products of the bakery their time was their own but most of their working time was taken up with deliveries for the bakery. They did not maintain or operate an independent business, had no independent place of business—not even a telephone. Deliveries of the bakery's products were made by them personally and they employed no assistance except when, through illness or otherwise they were unable to work, they employed relief drivers. The deductions from the wholesale price to which the drivers were entitled averaged from $300 to $750 a month per driver. Their arrangement with the bakery was terminable at the will of either party.

During the period covered by the assessment the pertinent provisions of law applicable to the tax imposed were supplemented by rule and amended from time to time so that during the period covered by the disputed assessment different provisions of the existing law applied, namely, from January 1, 1937 to February 1, 1938, the provisions

of the unemployment Act as originally enacted;[1] from February 1, 1938 to May 12, 1939, the provisions of the original Act supplemented by a rule of the territorial unemployment compensation board to which was committed the administration of the Act and whose rules had the force and effect of law, effective February 1, 1938; from May 12, 1939 to September 30, 1944, the amended Hawaii unemployment compensation law, effective May 12, 1939,[2] which, in addition to other amendments to which we shall advert, gave statutory status to the supplementary rule of February 1, 1938,[3] and the amendatory Act of May 20, 1941,[4] which inserted in what should be deemed "employment" the provision that "Service performed by an individual for wages or under any contract of hire shall be deemed to be employment subject to this Act irrespective of whether the common-law relationship of master and servant exists unless and until it is shown * * *," (here follow the tests first provided by rule and later enacted into law by the amendment of 1939).

Both the rule of February 1, 1938 and the amendments of 1939 and 1941 were, however, in our opinion, interpretive of the pre-existing provisions of the Act and if, as we hold, the plaintiff in respect to its drivers was subject to the unemployment compensation law as originally enacted, it was nonetheless subject to the terms of the Act as interpretively supplemented by the rule of February 1, 1938, and as amended by the amendments of 1939 and 1941. Part I of the original Act of 1937 contains a glossary of the terms employed in the Act and the respective definitions to be attributed thereto.

---

[1] Sess. Laws 1937, Act 243, ser. D-167.
[2] Sess. Laws 1939, Act 219, ser. D-185.
[3] *Id.* § 2 (k) (5).
[4] Sess. Laws 1941, Act 304, ser. D-250, § 1, subd. 8 (5).

22

They are quoted in the margin.[5] Similarly, the Act of 1939.[6] The quotation of the statutory enactment of the rule of February 1, 1938 will suffice for the exact language of both rule and statute. The amend-

---

[5] Sess. Laws 1937, Act 243, ser. D-167, § 5. " 'Employment' means services, including services in interstate or foreign commerce, performed within the Territory for remuneration or under any contract of hire, expressed or implied, oral or written * * *" except "Agricultural labor, etc."

*Id.* § 6. " 'Employee' means only a person who is or has been employed by an employer subject to this Act in an employment also subject to this Act."

*Id.* § 8. " 'Wages' means all remuneration including commissions and bonuses for employment, including the cash value of all remuneration payable in any medium other than cash."

*Id.* § 15. " 'Employer' means any individual or type of organization, including any partnership, association, trust, estate, joint-stock company, insurance company, or corporation, whether domestic or foreign, or the receiver, trustee in bankruptcy, trustee or successor thereof, or the legal representative of a deceased person, which on or subsequent to January 1, 1937, has or had in its employment one or more individuals * * *."

[6] Sess. Laws 1939, Act 219, ser. D-185, § 2 (i). " 'Employing unit' means any individual or type of organization, including any partnership, association, trust, estate, joint stock company, insurance company or corporation, whether domestic or foreign, or the receiver, trustee in bankruptcy, trustee or successor thereof, or the legal representative of a deceased person, which has or subsequent to January 1, 1937, had in its employ one or more individuals performing services for it within this Territory."

*Id.* § 2 (j). " 'Employer' means: (1) Any employing unit which for some portion of a day, but not necessarily simultaneously, in each of twenty different weeks, whether or not such weeks are or were consecutive, within either the current or the preceding calendar year, has or had in employment, one or more individuals (irrespective of whether the same individuals are or were employed in each such day.)"

*Id.* § 2 (k) (1). " 'Employment', subject to the other provisions of this subsection, means service, including service in interstate commerce, performed for wages or under any contract of hire, written or oral, express or implied," except "Agricultural labor, etc."

*Id.* § 2 (k) (5). "Services performed by an individual for wages or under any contract of hire shall be deemed to be employment subject

ment of 1941 is also quoted omitting the A, B, C tests.[7] The definition of the term "employer" was amended in 1943 and it is quoted in the margin.[8] An analysis of the amendments is also there.[9]

The plaintiff made no return to the unemployment compensation board of wages in respect to its drivers during the years 1937 to 1944, inclusive, and, as found by the trial court, "the tax commissioner during the years in controversy investigated, assessed and collected from the individual drivers gross income taxes on the amounts which these drivers procured as the differential between their sales to their customers and their costs paid to Bailey's Bakery." But in October of 1944 the

to this Act unless and until it is shown to the satisfaction of the board that,

"(A) such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

"(B) such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(C) such individual is customarily engaged in an independently established trade, occupation, profession, or business."

[7] Sess. Laws 1941, Act 304, ser. D-250, subd. 8 (5). "Services performed by an individual for wages or under any contract of hire shall be deemed to be employment subject to this Act irrespective of whether the common-law relationship of master and servant exists unless and until it is shown to the satisfaction of the board that—(here follow the A, B, C tests)."

[8] Sess. Laws 1943, Act 160, ser. D-167, § 1, 2 (j). " 'Employer' means:

" '(1) Any employing unit which for some portion of a day within the current calendar year has or had in employment one or more individuals."

[9] By the amendment of 1939 (Sess. Laws 1939, Act 219, ser. D-185, § 2 [k] [1]), the definition of employment is qualified by the phrase "subject to the other provisions of this subsection," the word "service" is used in its singular form and the word "wages" substituted for the word "remuneration." As so defined it is to be found in the re-

24

commission of labor and industrial relations, the successor in the administration of the unemployment compensation law to the unemployment compensation board, of its own motion determined that the plaintiff was an employer within the terms of the law, that the services rendered by the drivers were services performed for the bakery for wages and that it should make contributions on all wages earned by the drivers from January 1, 1937 to and including September 30, 1944. It made an assessment

vision of 1945 as § 4203. In the amendment of 1939 (Sess. Laws 1939, Act 219, ser. D-185, the definition of "employee" is omitted and the law since has not contained a definition of the word "employee." By the amendment of 1939 (Sess. Laws 1939, Act 219, ser. D-185), the definition of "wages" is repeated. (§ 2 [p]). It was further amended in 1941 (Sess. Laws 1941, Act 304, ser. D-250, § 1, part of subsection 12), and is to be found in the revision of 1945 as section 4211. By the amendment of 1939 the term "employer" is defined as "any employing unit which * * * has or had in employment one or more individuals" (§ 2 [j]), and the term "employing unit" is defined similarly as the word "employer" (§ 2 [i]) in the original Act, with certain additions with which we are not concerned. It appears in the 1945 revision as § 4202 (i). The definition of "employing unit" is carried into the revision referred to as section 4202 (h). The statutory enactment of the rule of the Board of February 1, 1938, by the amendment of 1939 (§ 2 [k] [5]), employs the exact language of the tests included in the rule except that in test B the word "all" is substituted for the word "any" in the prepositional phrase "of any of the places of business" and the services to which the rule relates are couched in different but substantially the same language. It reads: "Services performed by an individual for wages or under any contract of hire shall be deemed to be employment subject to this Act unless and until it is shown to the satisfaction of the board that" (here follow tests A, B an C). This provision was further amended by the amendment of 1941 to read as follows: "Services performed by an individual for wages or under any contract of hire shall be deemed to be employment subject to this Act irrespective of whether the common-law relationship of master and servant exists unless and until it is shown to the satisfaction of the board that" (here follow the A, B and C tests), (Sess. Laws 1941, Act 304, ser. D-250, § 1, subd. S [5]). This section as amended is § 4207 in the 1945 revision. The amendment of 1943 did not affect the situation.

accordingly.

As heretofore stated, the contributions assessed were paid by plaintiff under protest and the instant action was brought for their recovery. The case was tried before the circuit court, jury waived, and the court found for the plaintiff, holding in substance and effect that the relation existing between the bakery and the drivers under the new delivery system as originally inaugurated and subsequently developed created the legal relation of vendor and vendees, in other words, that the bakery sold its bread to the drivers and that the drivers were independent contractors and not subject to the provisions of the unemployment compensation law.

This action being one at law within the general jurisdiction of the circuit courts and the cause having been tried by the court, jury waived, the court, in compliance with the provisions of Revised Laws of Hawaii 1945, section 10107, rendered its decision in writing, setting forth its reasons therefor and incorporating therein what it denominated "Findings of fact" and "Conclusions of law." Unfortunately, however, the findings of fact contained in the court's written decision are not only incomplete in that findings upon material matters have been omitted but in a great many instances are in effect mere legal conclusions calculated to support the thesis of its decision. For instance, after declaring that the bakery had entered into "oral contracts with drivers * * * to sell to these drivers a daily supply of bread," it added that the undertaking was to supply "bread sufficient for these drivers in turn to supply their own customers." Thereafter, throughout the findings of fact the retailers to whom the drivers made deliveries are referred to as the drivers' "customers." We assume that the word "customers" was used by the court in its ordinarily accepted sense which includes the essential legal ingredients of a sale—a pure

conclusion of law. In one instance they are referred to as "contracting drivers." The court also in its findings referred to the collections made by the drivers as "their own collections" implying that the amount collected by them upon delivery was the property of the drivers and not that of the bakery. In speaking of the prices fixed by the bakery the same fault occurs. The court said: "The wholesale price to the driver for the same bread was on a cash sale basis to the driver, at a discount of the retail dealers' wholesale price. This differential between the price charged to the various retail stores and the price the drivers paid to Bailey's Bakery represented the gross return to the driver in the transaction." In referring to the drivers' daily requisitions for delivery of bread to the retailers the court refers to them as the "driver's purchase order." The character of the deduction to which the driver was entitled is in the following language: "The means from which the drivers received their compensation came directly from the customers" and despite the supervision by the bakery over deliveries of its products heretofore set forth, the court concluded "The only supervision the company had in this respect was to exercise the privilege of cutting down the gross amount sold to the driver where in the judgment of Bailey's Bakery the driver was returning too much bread, or where through curtailment of flour supplies on occasion the company had to prorate the amount of bread sold to the drivers in accordance with the restricted amount of bread baked through the curtailment of supplies." Under the circumstances, it will serve no useful purpose to recite the findings of fact of the trial court and they must be disregarded. Inasmuch, however, as there was no controversy upon the facts, and the evidence, whatever its source, was undisputed, the facts as heretofore recited will suffice for our conclusions upon the issues of law necessary for the disposition of this

appeal. They are: (1) did the services performed by the drivers in making delivery of the bakery's products constitute "services" within the meaning of that term as employed in section 5 of the 1937 Unemployment Compensation Act, as originally enacted and as subsequently amended, and (2) if so, were such services performed by the drivers for "remuneration" (or "wages")? Three extraneous issues are raised—(a) did the trial court err in finding as a fact that drivers sold their routes for prices that included substantial amounts for good will; (b) did the court hold that the tax base assessed includes the operational expense of the drivers and in considering the method of computing wages of the drivers and if so did it err in so holding; and (c) did the court err in considering as a part of the evidence in the case that "the tax assessor * * * during the years in controversy investigated, assessed and collected from the individual drivers gross income taxes on the amounts which these drivers procured as the differential between their sales to their customers and their costs paid to Bailey's Bakery"?

In support of the negative of the first question posed the bakery contends that the word "services" contained in the statutory definition of "employment" means personal services performed for another; that the services rendered by the drivers were not performed for the bakery but for themselves upon the resale and the delivery by them to the retailers of the bakery's products which they, the drivers, had previously purchased from the bakery and that if the vendor-vendee relationship was not created by the delivery contracts between the bakery and the drivers the relationship created by said delivery contracts was that of contractee and independent contractors and that the drivers as independent contractors were not subject to the provisions of the unemployment compensation law.

It should be emphasized at the outset that the unem-

ployment compensation law was enacted by the legislature for the relief of workers under the stress of unemployment occasioned through no fault of their own; that in construing the provisions of the law designed to effect that purpose they should be liberally construed "in the light of the mischief to be corrected and the end to be attained,"[10] and that "Where words are defined in a particular statute, and it is clear that the legislature intended to give such words a different meaning than the one generally and ordinarily given * * * the statutory definition is the one to be applied."[11]

The words "employment," "employee," "wages" and "employer," as ordinarily employed, are words of art. To them are attached common-law definitions and connotations well defined and understood. But is is apparent from the respective definitions of those terms contained in the law as originally enacted that the legislature made a studied effort to avoid limitation upon the class to be benefited by rejecting standards that might restrict it exclusively to workers sustaining a master-servant relationship, as understood at common law and to include all workers whom the law was socially designed to protect. By the adoption of controlling definitions it sought to effect coverage not only for workers employed under "contracts of hire" but also those who performed personal

---

[10] Warner v. Goltra, 293 U. S. 155, 158; Board v. Hearst Publications, 322 U. S. 111, 126; United States v. Silk, 331 U. S. 704, 712; see also U. S. v. Amer. Trucking Ass'ns., 310 U. S. 534, 535, construing the word "employee" as employed in the Motor Carrier Act; South Chicago Co. v. Bassett, 309 U. S. 251, 259, construing the same word as used in the Harbor Workers' Compensation Act; Rutherford Food Corp. v. McComb, 331 U. S. 722, construing the same word in the Fair Labor Standards Act.

[11] Creameries of America v. Ind. Comm. et al., 98 Utah, 571; Territory v. Rogers, 37 Haw. 566; Asaeda v. Haraguchi, 37 Haw. 556; Brodhead v. Borthwick, 37 Haw. 314; Pan. Am. Air. v. Godbold, 36 Haw. 170.

"services" for "remuneration" (or "wages") under contracts of service, the terms and conditions of which subjected them to the same contingencies of unemployment and resulting distress as those occupying the master-servant relationship. These definitions, though amended from time to time, remained substantially the same and were patently designed to preserve that purpose.

1. In our opinion, the contracts of service between the bakery and the drivers did not create a vendor-vendee relation but one of master and servant in that the drivers were employed under "contracts of hire" as that term is understood at common law and as employed in section 5 of the Act of 1937 and as subsequently amended. The terms of the contracts of service upon the uncontradicted evidence contemplated the delivery of bakery products for cash upon delivery except where sales were made upon credit. To say that the price charged against drivers at the plant was the sales price to the drivers stems from the failure to evaluate the legal effects of a sale of goods for cash upon delivery and the methods devised for computing the drivers' remuneration. To assume that the amount arbitrarily set by the bakery as the basis of computing the amount to be retained by the drivers from the wholesale price to be collected by them upon delivery was a wholesale price to the drivers, and based upon this assumption to further assume that there was a sale at the plant to the drivers at the price so fixed, is to disregard the terms of the drivers' employment. The price charged the drivers at the plant was arbitrarily fixed by the bakery for the sole purpose of determining the remuneration of the drivers for the delivery service performed by them. We do not know, the evidence fails to disclose whether the discrimination between cash and credit customers was a carry-over from the pre-existing delivery system, but whatever its source it was a condi-

tion imposed by the bakery and not by the drivers. The title to products to be delivered for cash never passed out of the bakery until delivered to and paid for by the retailer. That the drivers upon occasion disobeyed this injunction is immaterial. It is insisted by no less a party than the plaintiff itself that the drivers disobeyed these instructions upon their own responsibility and were required to personally account to the bakery for the amount payable to the bakery out of the wholesale price. In the case of a sale for cash upon delivery, payment is a condition precedent to the passing of title from the seller to the purchaser. No claim is made that the products sold on credit were sold to the drivers at the plant and yet the remuneration for delivery was computed in the same way. In the one instance (cash on delivery) the driver deducted his remuneration from the collections and in the other (credit) the bakery in effect paid him cash. The drivers never acquired title to the bread delivered by them. They were merely bailees for the purpose of delivery to those to whom the bakery sold the bread and to whom it was obligated to make delivery of the subject of sale. From all the evidence and all the inferences of which it is capable, the only vendor-vendee relation created was that between the bakery and the retailers and the drivers were merely the manual and physical means by which the bakery fulfilled its obligation to the purchasers of its products to make delivery of the products sold. Moreover, collections, when made, were the property of the bakery subject only to the condition that from such collections the drivers were privileged to deduct eight mills for every loaf delivered and retain the same. The remainder of the collections continued to be the property of the bakery. Under the circumstances, the services performed by the drivers were personal to the bakery and constituted "services" under "contracts of hire" as those terms are employed

in the Act as originally enacted and subsequently amended.[12]

Nor do we believe that the drivers under their contracts of service were independent contractors. The respective definitions of "master," "servant" and "independent contractor" contained in the Restatement of the Law of Agency are quoted in the margin.[13] To the definition of "servant" repeated in the Restatement, in section 220, are appended factual considerations directed to the distinction between a servant and independent contractor. They are also copied in the margin.[14] The control test is the deciding factor. Many of the authorities hold that an

[12] In re Scatola, 14 N. Y. Supp. (2d) 55, aff'd, 282 N. Y. 689, 26 N. E. (2d) 815; In re Perdziak, 19 N. Y. Supp. (2d) 1000; In re Castaldo, 30 N. Y. Supp. (2d) 736; Jack & Jill, Inc. v. Tone, 126 Conn. 114, 9 A. (2d) 497; and cases cited in note 29.

[13] Sec. 2. "(1) A master is a principal who employs another to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.

"(2) A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.

"(3) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking."

[14] "(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

"(b) whether or not the one employed is engaged in a distinct occupation or business;

"(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

"(d) the skill required in the particular occupation;

"(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

"(f) the length of time for which the person is employed;

"(g) the method of payment, whether by the time or by the job;

"(h) whether or not the work is a part of the regular business

essential of the common-law master-servant relationship is the complete control by the master of all the details of the physical activities of the servant. And if this were so then the lack of control by the bakery over the maintenance and operation of the delivery equipment owned by the drivers might be considered as excluding the drivers from the master-servant relationship and placing them in the category of independent contractors. But in our opinion, due to the original sphere of application of the control test to the vicarious liability under the doctrine of *respondeat superior,* the rigidity of the test must yield to the objects and purposes of social insurance and the control reserved to the principal for unemployment compensation purposes need not extend to all the details of the physical performance of the service by the worker that may be essential to the master-servant relationship but may be merely a general one[15] exercisable, directly or indirectly, over the physical activities and time surrendered by the worker. The bakery had a general control over the drivers. The subject of sale, the terms of sale and the proceeds of sale remained in its control. The only differences between the delivery system as reorganized and as it previously existed were the substitution of commissions for fixed wages, irregular for regular hours of service and the provision by the drivers of their own instead of company equipment. The right to control may exist not alone from express contractual rights but from the right to terminate

---

of the employer; and

"(i) whether or not the parties believe they are creating the relationship of master and servant."

[15] Jack & Jill, Inc. v. Tone, 126 Conn. 114, 9 A. (2d) 497; Robert C. Buell & Co. v. Danaher, 127 Conn. 606, 18 A. (2d) 697; Matter of Morton, 284 N. Y. 167, 30 N. E. (2d) 369; Matter of Electrolux Corporation, 288 N. Y. 440, 43 N. E. (2d) 480; Cal. Emp. Com. v. L. A. Etc. News Corp., 24 Calif. (2d) 421, 150 P. (2d) 186; B. P. Schulberg Prod. v. Cal. Emp. Com., 66 Calif. App. (2d) 831, 153 P. (2d) 404.

the employment at any time and the consequent economic subjection of the worker. The fact that the drivers regulated their own hours of work has no significance. The bakery was indifferent provided deliveries were made daily. If any driver did not conform to the general purposes of the delivery system installed by the management the bakery was at liberty to discharge him from its employment. "The right to discharge is one of the strong indications that the relation is one of employment."[16] The drivers were not employed or engaged in a distinct occupation. It would seem that when applied to social security insurance, the factor of the contractor being engaged in a distinct business or occupation in which skill is required, the factual considerations referred to in marginal note 14, (b) and (d), are equally, if not more, important than the control test.[17] That the drivers solicited new business does not affect the situation. The psychology of the scheme devised is obvious. It played upon the avidity of the drivers for increased remuneration. Each driver constituted himself a solicitor for new business within the district to which he was assigned. The result operated for the benefit of the bakery as well as the driver. Daily deliveries by bakeries such as here are usually done under the direction of an employer. The skill required was no greater than that formerly required under the pre-existing delivery system. That an agent makes use of his own car in his master's business is not a test of determining whether an employee is an independent contractor.[18] The employment was not coterminous with the completion of the

[16] Aisenberg v. Adams Co. Inc., 95 Conn. 419, 111 Atl. 591, 592; see also Lassen v. Stamford Transit Co., 102 Conn. 76, 128 Atl. 117.

[17] Mullich v. Brocker, 119 Mo. App. 332, 97 S. W. 549.

[18] Burgess v. Garvin & Price Merc. Co., 219 Mo. App, 162, 272 S. W. 108; Dillon v. Prudential Ins. Co. of America, 75 Calif. App. 266, 242 Pac. 736; Chatelain v. Thackeray et al., 98 Utah, 525, 100 P. (2d) 191.

34

service but continuous subject to power of the bakery to summarily discharge at will and the right of the driver to quit at any time. The delivery system did not contemplate a definite beginning, continuation and ending. It began with employment and continued subject to termination by either party at any time. The method of remuneration was similar in all respects to piece work. Delivery of its products is a part of the regular business of the bakery. Those drivers who gave expression to their belief upon the subject testified that they worked for the bakery "on commission," for "straight commissions"; in other words, that the relation created was that of master and servant and their remuneration was in the form of commissions. It is true that the maintenance and operation of the equipment provided by the driver was not subject to the control of the bakery. But the maintenance and operation of the equipment was merely incidental to the service for which the drivers were employed and the discretion committed to the drivers in that respect is not inconsistent with the legal relation of master and servant. The mere fact that a servant under his contract of service is required to furnish his own equipment does not *per se* place him in the classification of an independent contractor. Driver-owners of trucks or wagons have been held employees in accident suits[19] and under workmen's compensation laws.[20] Application of the definition of "servant" and the prescribed considerations to the undisputed facts

---

[19] Western Express Co. v. Smeltzer, 88 F. (2d) 94; Bradley v. Republic Creosoting Co., 281 Mich. 177, 274 N. Y. 754; Showers v. Lund, 123 Neb. 56, 242 N. W. 258; Dunn v. Reeves Coal Yards Co. Inc., 150 Minn. 282, 184 N. W. 1027; Waters v. Pioneer Fuel Co., 52 Minn. 474, 55 N. W. 52; Warner v. Hardwood Lumber Co., 231 Mich. 328, 204 N. W. 107; Singer Manufacturing Co. v. Rahn, 132 U. S. 518.

[20] Industrial Com. v. Bonfils, 78 Colo. 306, 241 Pac. 735; Coppes Bros. & Zook v. Pontius, 76 Ind. App. 298, 131 N. E. 845; Burruss v. B. M. C. Logging Co., 38 N. M. 254, 31 P. (2d) 263; Rouse v. Town of

support the conclusion that the drivers were employees of the bakery under the common-law concepts of the master-servant relation.

If the drivers sustained to the bakery the common-law master-servant relationship, then they were parties to a "contract of hire" as that term is employed in section 5 of the original Act and as subsequently amended. Moreover, if parties to a "contract of hire," their services under such contract unquestionably constituted "employment" as defined in that section and it becomes unnecessary to discuss whether, if not servants within accepted common-law concepts of that relation, they performed "services" for "wages," the alternative class of services included in section 5. But assuming, though not conceding, that judged by common-law concepts of the term "contract of hire," a particular in contradistinction to a general control by the master of the physical activities of the servant is an essential ingredient of the relation thereby created, in our opinion, as heretofore indicated, though a contract of hire may not legally exist, as that term is understood at common law, if services were rendered for "remuneration" or "wages" as defined by the unemployment compensation law, by virtue of the specialized definitions of the terms "employer," "employing unit" and "employment" as defined and employed in the statute, the only test applicable is whether the individual performing the services was, in respect thereto, clearly an independent contractor, in other words, in respect to the services performed by him, he could successfully pass all the tests applicable to an

Bird Island, 169 Minn. 367, 211 N. W. 327; Industrial Com. v. Hammond, 77 Colo. 414, 236 Pac. 1006; Kirk v. Lime Co. and Insurance Co., 137 Me. 73, 15 A. (2d) 184; Burt v. Davis-Wood Lumber Co., 157 La. 111. 102 So. 87; Frost v. Blue Ridge Timber Corp., 158 Tenn. 18, 11 S. W. (2d) 860; Lee v. Mark H. Brown Lumber Co., 15 La. App. 294, 131 So. 697; Nestle's Food Co. v. Industrial Comm., 205 Wis. 467, 237 N. W. 117.

independent contractor relationship.

The relation of master and servant is not an essential prerequisite to the imposition of the tax. The general objective of social insurance is to increase the coverage beyond the class occupying the strictly master-servant relationship and include all workers not clearly independent of superior control and whose employment status is such that in the event of unemployment they may suffer equally as those admittedly sustaining the master-servant relationship. The legal incidents of the employment relation has been modified by the necessities of social security. The specialized definitions employed in the law indicate a recession from the common-law concepts of the master-servant relationship and the creation of an employer-employee relationship unknown to the common law, the only exclusion from which is the purely independent contractor relation. Hence it may be said that the drivers were not only individuals performing service under "contracts of hire" within the meaning of the law, but also ones performing "services for wages."

Whether motivated by social demands of the times or the credits offered and extended by the Federal Social Security Act,[21] all of the states, territories and the District of Columbia adopted local unemployment compensation laws calculated to synchronize with the Federal Act. All local Acts were subject to the approval of the Federal Social Security Board[22] and they followed a formula approved by the Board. Obviously, in order that the local and Federal Acts should cover the same field and that the beneficiaries under local Acts should not exceed those contemplated by the Federal Act, the provisions of the local law could be no broader than the provisions of the federal law. Nor could the local Acts restrict the number of the

[21] 49 Stat. pt. 1, c. 531, p. 639, tit. IX, §§ 902, 909(a), 910(a).
[22] *Id.* § 903 (a).

beneficiaries and, at the same time, secure approval by the Federal Social Security Board which was a condition precedent to the allowance and extention of credit. The pertinent definitions of the federal unemployment compensation law are quoted in the margin.[23] The drafters of the formula which provided the standard of all local Acts were therefore hard put to it to devise definitions of the controlling terms employed therein so that the local Acts would conform to the provisions of the Federal Act. Conformity with the Federal Act was both objective and subjective. This is apparent in the express provision of the Hawaii 1937 Act[24] that if at any time the Federal Social Security Act should be amended with respect to the definition of the word "employment" the Act should be deemed to be likewise amended and the definition of "employment"[25] of the Act should thereafter conform to such amendment to the Social Security Act. As might be expected, judicial exploration of the provisions of the federal and local unemployment compensation laws resulted in conflicts in statutory construction. Some courts

---

[23] *Id.* § 907 (a). "The term 'employer' does not include any person unless on each of some 20 days * * * the total number of individuals who were in his employ * * *." § 907 (b). "The term 'wages' means all remuneration for employment, including the cash value of all remuneration paid in any medium other than cash." § 907 (c). "The term 'employment' means any service, of whatever nature, performed * * * by an employee for his employer, except * * *." § 1101 (b). "The terms 'includes' and 'including' when used in a definition contained in this Act shall not be deemed to exclude other things otherwise within the meaning of the term defined." Neither the term "employee" nor "independent contractor" appears in the Federal Social Security Act. The term "independent contractor" is not employed in the Wagner Act (Nat. Lab. Relations Act, 29 U. S. C. §§ 151, 160 [1940]), but does appear in the Taft-Hartley Act (Publ. No. 101, 80th Cong. 1st Sess. [June 23, 1947]), which was enacted after the rendition of the opinion in the Hearst case.

[24] § 67.

[25] § 5.

insisted upon applying to the relation in controversy the common-law concepts of the master-servant relationship; other courts, with greater discernment and appreciation of the significance of specialized terminology employed and the social results sought to be attained, gave to similar provisions an opposite construction. But out of the welter of conflicting opinion has emerged two decisions of the United States Supreme Court which have settled this conflict and set up the legal guideposts by which the Federal Unemployment Compensation Act is to be construed. We refer to the cases of *Board* v. *Hearst Publications, supra,* note 10, and *United States* v. *Silk, supra,* note 10. It is interesting to note that the succeeding decision following the *Silk* case, *Rutherford Food Corp.* v. *McComb, supra,* note 10, involved the meaning of the same term "employee" as employed in the Fair Labor Standards Act.[26] And the court in the *Rutherford* case followed the rationale of the *Hearst* and *Silk* cases. These decisions are binding upon this court and are the bases of our conclusion that the services of the drivers constituted "services" within the meaning of the definition of "employment" as defined in section 5 of the 1937 Act and as subsequently amended. The *Hearst* case involved the question whether the provisions of the National Labor Relations Act (Wagner Act) applied to newsboys (generally mature men) who sold the daily papers of certain publishers on the streets of Los Angeles. The newsboys in question sold papers at prices fixed by the publishers and their remuneration or profit was the difference between the selling price and a lesser price also fixed by the publisher. Certain equipment, such as racks and money-change aprons, were furnished the newsboys by the publishers. They also exercised considerable control over the activities of the

---

[26] 52 Stat. p. 1060.

newsboys such as assigning "spots" or street corners at which sales were to be made, transferring newsboys from one spot to another; prescribing the hours of work; visiting sanctions upon the tardy and delinquent and imposing sales technique.

The Wagner Act extends to "employees." Neither by the Act nor by the regulations of the National Labor Relations Board was the term defined and the paramount issue was whether its meaning, as employed in the Act, should be determined by "common-law standards" or by the "history, terms and purposes of the legislation."

Upon the applicability of common-law standards of the master-servant relationship to unemployment compensation the court said:

"The principal question is whether the newsboys are 'employees.' Because Congress did not explicitly define the term, respondents say its meaning must be determined by reference to common-law standards. In their view 'common-law standards' are those the courts have applied in distinguishing between 'employees' and 'independent contractors' when working out various problems unrelated to the Wagner Act's purposes and provisions.

"The argument assumes that there is some simple, uniform and easily applicable test which the courts have used, in dealing with such problems, to determine whether persons doing work for others fall in one class or the other. Unfortunately this is not true. Only by a long and tortuous history was the simple formulation worked out which has been stated most frequently as 'the test' for deciding whether one who hires another is responsible in tort for his wrongdoing. But this formula has been by no means exclusively controlling in the solution of other problems. And its simplicity has been illusory because it is more largely simplicity of formulation than of application. Few problems in the law have given greater variety

of application and conflict in results than the cases arising in the borderland between what is clearly an employer-employee relationship and what is clearly one of independent, entrepreneurial dealing. This is true within the limited field of determining vicarious liability in tort. It becomes more so when the field is expanded to include all of the possible applications of the distinction.

"It is hardly necessary to stress particular instances of these variations or to emphasize that they have arisen principally, first, in the struggle of the courts to work out common-law liabilities where the legislature has given no guides for judgment, more recently also under statutes which have posed the same problem for solution in the light of the enactment's particular terms and purposes.

"It is enough to point out that, with reference to an identical problem, results may be contrary over a very considerable region of doubt in applying the distinction, depending upon the state or jurisdiction where the determination is made; and that within a single jurisdiction a person who, for instance, is held to be an 'independent contractor' for the purpose of imposing vicarious liability in tort may be an 'employee' for the purposes of particular legislation, such as unemployment compensation."

The court found that "Congress had in mind a wider field than the narrow technical legal relation of 'master and servant,' as the common law had worked this out in all its variations, and at the same time a narrower one than the entire area of rendering service to others."

To determine "how much was included of the intermediate region between what is clearly and unequivocally 'employment,' by any appropriate test, and what is as clearly entrepreneurial enterprise and not employment" the court looked to the purposes of the Act, employing the following approach:

"The mischief at which the Act is aimed and the

remedies it offers are not confined exclusively to 'employees' within the traditional legal distinctions separating them from 'independent contractors.' Myriad forms of service relationship, with infinite and subtle variations in the terms of employment, blanket the nation's economy. Some are within this Act, others beyond its coverage. Large numbers will fall clearly on one side or on the other, by whatever test may be applied. But intermediate there will be many, the incidents of whose employment partake in part of the one group, in part of the other, in varying proportions of weight. And consequently the legal pendulum, for purposes of applying the statute, may swing one way or the other, depending upon the weight of this balance and its relation to the special purpose at hand.

"Unless the common-law tests are to be imported and made exclusively controlling, without regard to the statute's purposes, it cannot be irrelevant that the particular workers in these cases are subject, as a matter of economic fact, to the evils the statute was designed to eradicate and that the remedies it affords are appropriate for preventing them or curing their harmful effects in the special situation. Interruption of commerce through strikes and unrest may stem as well from labor disputes between some who, for other purposes, are technically 'independent contractors' and their employers as from disputes between persons who, for those purposes, are 'employees' and their employers. *Cf. Drivers' Union* v. *Lake Valley Co.,* 311 U. S. 91. Inequality of bargaining power in controversies over wages, hours and working conditions may as well characterize the status of the one group as of the other. The former, when acting alone, may be as 'helpless in dealing with an employer,' as 'dependent . . . on his daily wage' and as 'unable to leave the employ and to resist arbitrary and unfair treatment' as the latter.

42

For each, 'union . . . [may be] essential to give . . . opportunity to deal on equality with their employer.' And for each, collective bargaining may be appropriate and effective for the 'friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions.' 49 Stat. 449. In short, when the particular situation of employment combines these characteristics, so that the economic facts of the relation make it more nearly one of employment than of independent business enterprise with respect to the ends sought to be accomplished by the legislation, those characteristics may outweigh technical legal classification for purposes unrelated to the statute's objectives and bring the relation within its protections."

The Labor Relations Board, to whom was entrusted by the Act the determination of the facts in the first instance, had found "Their hours of work and their efforts on the job are supervised and to some extent prescribed by the publishers or their agents" and concluded that the newsboys were employees. The Circuit Court of Appeals, to review whose judgment the writ of *certiorari* in the *Hearst* case issued, had held that the basic inquiry was "* * * where the right to control lies, and the control referred to must be complete control of the means and methods of performance."[27]

Upon the question of whether, under the Act, the control test adopted by the Circuit Court of Appeals was applicable to determine whether the newsboys were employees within the meaning of the Act or independent contractors, the Supreme Court said:

"To eliminate the causes of labor disputes and industrial strife, Congress thought it necessary to create a

[27] Hearst Publications v. National L. Relations Board, 136 F. (2d) 608, 612, 613.

balance of forces in certain types of economic relationships. These do not embrace simply employment associations in which controversies could be limited to disputes over proper 'physical conduct in the performance of the service.' On the contrary, Congress recognized those economic relationships cannot be fitted neatly into the containers designated 'employee' and 'employer' which an earlier law had shaped for different purposes. Its Reports on the bill disclose clearly the understanding that 'employers and employees not in proximate relationship may be drawn into common controversies by economic forces,' and that the very disputes sought to be avoided might involve 'employees [who] are at times brought into an economic relationship with employers who are not their employers.' In this light, the broad language of the Act's definitions, which in terms reject conventional limitations on such conceptions as 'employee,' 'employer,' and 'labor dispute,' leaves no doubt that its applicability is to be determined broadly, in doubtful situations, by underlying economic facts rather than technically and exclusively by previously established legal classifications. *Cf. Labor Board* v. *Blount, supra.*

"Hence 'technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants' have been rejected in various applications of this Act both here (*International Association of Machinists* v. *Labor Board,* 311 U. S. 72, 80-81; *H. J. Heinz Co.* v. *Labor Board,* 311 U. S. 514, 520-521) and in other federal courts (*Labor Board* v. *Condenser Corp.,* 128 F. 2d 67 (C. C. A.); *North Whittier Heights Citrus Assn.* v. *Labor Board,* 109 F. 2d 76, 82 (C. C. A.); *Labor Board* v. *Blount, supra*). There is no good reason for invoking them to restrict the scope of the term 'employee' sought to be done in this case. That term, like other provisions, must be understood with reference to the purpose of the Act and the facts involved

44

in the economic relationship. 'Where all the conditions of the relation require protection, protection ought to be given.'

"It is not necessary in this case to make a completely definitive limitation around the term 'employee.' That task has been assigned primarily to the agency created by Congress to administer the Act. Determination of 'where all the conditions of the relation require protection' involves inquiries for the Board charged with this duty. Everyday experience in the administration of the statute gives it familiarity with the circumstances and backgrounds of employment relationships in various industries, with the abilities and needs of the workers for self-organization and collective action, and with the adaptability of collective bargaining for the peaceful settlement of their disputes with their employers. The experience thus acquired must be brought frequently to bear on the question who is an employee under the Act. Resolving that question, like determining whether unfair labor practices have been committed, 'belongs to the usual administrative routine' of the Board. *Gray* v. *Powell*, 314 U. S. 402, 411. Cf. *Labor Board* v. *Standard Oil Co.*, 138 F. 2d 885, 887-888."

The *Silk* case involved the question whether the workers were "employees" within the meaning of that term as employed in the Social Security Act.[28] Silk sold coal at retail in the city of Topeka, Kansas. For unloading coal at his place of business from railroad cars into bins he employed workers who furnished their own tools, had no stated wages or hours of employment and were at liberty to work when they pleased and also for others. They were paid by the ton unloaded. Silk owned no trucks himself but contracted with workers who owned their own

---

[28] Tits. VIII and IX, Social Security Act, 49 Stat. 636 and 639, as repealed in part, 53 Stat. 1.

trucks to deliver coal at a uniform price per ton. There was no supervision by Silk further than to indicate on a ticket the place of delivery and whether the charge was to be collected or not. The truckers voluntarily adopted a call list upon which their names come up in turn, supplied, maintained and operated their own equipment and employed such assistance as was necessary.

Upon the question of the application of common-law standards of the master-servant relationship to the term "employee" as used in the Act, the court reverted to its decision in the *Hearst* case, saying:

"The problem of differentiating between employee and an independent contractor, or between an agent and an independent contractor, has given difficulty through the years before social legislation multiplied its importance. When the matter arose in the administration of the National Labor Relations Act, we pointed out that the legal standards to fix responsibility for acts of servants, employees or agents had not been reduced to such certainty that it could be said there was 'some simple, uniform and easily applicable test.' The word 'employee,' we said, was not there used as a word of art, and its content in its context was a federal problem to be construed 'in the light of the mischief to be corrected and the end to be attained.' We concluded that, since that end was the elimination of labor disputes and industrial strife, 'employees' included workers who were such as a matter of economic reality. The aim of the Act was to remedy the inequality of bargaining power in controversies over wages, hours and working conditions."

Upon the question of the rule of construction to be applied the court said:

"No definition of employer or employee applicable to these cases occurs in the Act. See § 907 (a) and I. R. C. § 1607 (a). Compare, as to carrier employment, I. R. C.

§ 1532 (d), as amended by 60 Stat. 722, § 1. Nothing that is helpful in determining the scope of the coverage of the tax sections of the Social Security Act has come to our attention in the legislative history of the passage of the Act or amendments thereto.

"Since Congress has made clear by its many exceptions, such as, for example, the broad categories of agricultural labor and domestic service, 53 Stat. 1384, 1393, that it was not its purpose to make the Act cover the whole field of service to every business enterprise, the sections in question are to be read with the exemptions in mind. The very specificity of the exemptions, however, and the generality of the employment definitions indicates that the terms 'employment' and 'employee' are to be construed to accomplish the purposes of the legislation. As the federal social security legislation is an attack on recognized evils in our national economy, a constricted interpretation of the phrasing by the courts would not comport with its purpose. Such an interpretation would only make for a continuance, to a considerable degree, of the difficulties for which the remedy was devised and would invite adroit schemes by some employers and employees to avoid the immediate burdens at the expense of the benefits sought by the legislation. These considerations have heretofore guided our construction of the Act. *Buckstaff Bath House Co.* v. *McKinley,* 308 U. S. 358; *Social Security Board* v. *Nierotko,* 327 U. S. 358.

"* * * We [in the *Hearst* case] rejected the test of the 'technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants.' This is often referred to as power of control, whether exercised or not, over the manner of performing service to the industry. Restatement of the Law, Agency, § 220. We approved the statement of the National Labor Relations Board that 'the primary consideration in the determina-

tion of the applicability of the statutory definition is whether effectuation of the declared policy and purposes of the Act comprehend securing to the individual the rights guaranteed and protection afforded by the Act.' *Labor Board* v. *Hearst Publications,* 322 U. S. 111, 120, 123, 124, 128, 129, 131.

"Application of the social security legislation should follow the same rule that we applied to the National Labor Relations Act in the *Hearst* case."

The distinction made by the court between the master-servant and independent contractor relationship makes its exact language especially apt:

"Of course, this does not mean that all who render service to an industry are employees. Compare *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514, 520. Obviously the private contractor who undertakes to build at a fixed price or on cost-plus a new plant on specifications is not an employee of the industry thus served nor are his employees. The distributor who undertakes to market at his own risk the product of another, or the producer who agrees so to manufacture for another, ordinarily cannot be said to have the employer-employee relationship. Production and distribution are different segments of business. The purposes of the legislation are not frustrated because the Government collects employment taxes from the distributor instead of the producer or the other way around.

"* * * This, of course, does not leave courts free to determine the employer-employee relationship without regard to the provisions of the Act. The taxpayer must be an 'employer' and the man who receives wages an 'employee.' There is no indication that Congress intended to change normal business relationships through which one business organization obtained the services of another to perform a portion of production or distribution. Few businesses are so completely integrated that they can them-

48

selves produce the raw material, manufacture and distribute the finished product to the ultimate consumer without assistance from independent contractors. The Social Security Act was drawn with this industrial situation as a part of the surroundings in which it was to be enforced. Where a part of an industrial process is in the hands of independent contractors, they are the ones who should pay the social security taxes.

"* * * Certainly the industry's right to control how 'work shall be done' is a factor in the determination of whether the worker is an employee or independent contractor.

"* * * Probably it is quite impossible to extract from the statute a rule of thumb to define the limits of the employer-employee relationship. The Social Security Agency and the courts will find that degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation are important for decision. No one is controlling nor is the list complete. These unloaders and truckers and their assistants are from one standpoint an integral part of the businesses of retailing coal or transporting freight. Their energy, care and judgment may conserve their equipment or increase their earnings but * * * Silk are the directors of their businesses. On the other hand, the truckmen hire their own assistants, own their trucks, pay their own expenses, with minor exceptions, and depend upon their own initiative, judgment and energy for a large part of their success.

"* * * Giving full consideration to the concurrence of the two lower courts in a contrary result, we cannot agree that the unloaders in the *Silk* case were independent contractors. They provided only picks and shovels. They had no opportunity to gain or lose except from the work of their hands and these simple tools. That the unloaders

did not work regularly is not significant. They did work in the course of the employer's trade or business. This brings them under the coverage of the Act. They are of the group that the Social Security Act was intended to aid. Silk was in a position to exercise all necessary supervision over their simple tasks. Unloaders have often been held to be employees in tort cases.

"There are cases, too, where driver-owners of trucks or wagons have been held employees in accident suits at tort or under workmen's compensation laws. But we agree with the decisions below in *Silk* * * * that where the arrangements leave the driver-owners so much responsibility for investment and management as here, they must be held to be independent contractors. These driver-owners are small businessmen. They own their own trucks. They hire their own helpers. In one instance they haul for a single business, in the other for any customer. The distinction, though important, is not controlling. It is the total situation, including the risk undertaken, the control exercised, the opportunity for profit from sound management, that marks these driver-owners as independent contractors."

What the court held in the *Silk* case is not as important as the implications of its conclusions. Implicit in the decision in that case is the deduction that a beneficiary under the Act need not sustain common-law master-servant relationship and that the control test as applied to the vicarious liability of masters under the *respondeat superior* doctrine is not the controlling factor in determining the legal status of the worker. Applying the rationale of the *Hearst* and *Silk* cases to the Hawaii unemployment compensation law, we conclude that it is not sufficient to establish immunity from its terms and provisions to show that there had not been reserved to the master the extent of control necessary to establish the relationship of master

and servant when measured by the technical standards of the common law. But it must appear that the worker is free from the direction or control both under his contract of service and in fact and is not within the class of workers that the law was designed to protect.

2. Not alone were the services rendered by the drivers "services," as that term is used in the unemployment compensation law, but they were also performed for "remuneration" or "wages." There is nothing in the facts that in our opinion, gives rise to any other conclusion than that the amounts which the drivers were entitled to deduct from the collections made by them were commissions, as that term is generally understood, and come within the definitions of the words "wages" and "remuneration" as defined in the Act as originally passed and subsequently amended. The money collected by the drivers before deductions was the property of the bakery and not the drivers. The amount of collections remaining after deduction was the property of the bakery and not the drivers. It was not until the deduction was made that the amount deducted became the property of the driver. The amount deducted by them comes within the ordinary accepted meaning of the word "commission"[29] and constituted the drivers' "remuneration" or "wages" for the "services" rendered by them.

Holding as we do that the drivers sustained towards the bakery an employer-employee relationship within the meaning of the word "employment" as defined in section 5

---

[29] State ex rel. Mulhausen v. Sup. Ct., 22 Wash. (2d) 811, 157 P. (2d) 938; Creameries of America v. Ind. Comm., supra, note 11; Sisk v. Arizona Ice & Cold Storage Co., 60 Ariz. 496, 141 P. (2d) 395; Moorman Mfg. Co. v. Industrial Comm., 241 Wis. 200, 5 N. W. (2d) 743, 745; Singer Sewing Mach. Co. v. State U. Compensation Com'n., 116 P. (2d) 744, 748 (Ore.); Unemployment Comp. Com'n. v. Jefferson S. L. Ins. Co., 215 N. C. 479, 2 S. E. (2d) 584; Journal Pub. Co. v. State U. C. Com., 175 Ore. 627, 155 P. (2d) 570.

of the Act as originally enacted, it becomes immaterial to the issues to determine the legal effect of the A, B, C tests, as promulgated by rule or legislatively enacted, upon the legal relation sustained by the drivers to the bakery during the time when they were respectively effective. The incorporation of the tests in the law certainly did not restrict the class of workers to which the definition of employment referred prior to the addition of the tests. The A, B, C tests do not subtract from the significance of the use of the word "service" in the definition of "employment" nor the implication of the category of "services for wages" in addition to that of "contracts of hire." We deem it unnecessary and expressly refrain from passing any opinion upon whether the tests enlarged the class.

A.  There was no evidence to sustain the finding of the trial court that the drivers sold their routes for prices that included substantial amounts for good will. Nor did the evidence admit of any inference to that effect. The evidence upon the subject of prices at which routes were sold was purely abstract and we have no means of knowing the items, if any, included in the sales price. There was no breakdown of the sales prices and if any inferences may be indulged we would conclude that the evidence referred to the value of the equipment involved in the sales.

B.  From an examination of the record, it does not appear that the court held that the tax base assessed included the operational expenses of the drivers. There was no evidence of the method by which the tax assessed was computed and the absence of this evidence gives support to the conclusion that the reference by the court to the element of operational expense was merely argumentative in its consideration of the incidents of the tax.

C.  Nor are we satisfied that the court considered the action of the tax commissioner in assessing and collecting

"from individual drivers gross income taxes on the amounts which these drivers procured as the differential between their sales to their customers and their costs paid to Bailey's Bakery," as a bar or as an administrative interpretation of the assessment in controversy. The reference to gross income taxes was an afterthought and offered by the court as an additional factual reason for its conclusion. The court did not hold that the action of the tax commissioner constituted a bar. If it considered this evidence as an administrative interpretation of the unemployment compensation law it was error. The administration of the Unemployment Compensation Act was by law originally committed to the territorial unemployment compensation board and since the amendment of 1941 to the labor and industrial relations commission. The only duty imposed upon the tax commissioner by the unemployment compensation law is the ministerial duty of collection of taxes after assessment by the board or commission. The administration of the gross income tax law is committed to the tax commissioner. But his acts constitute, if they may be so dignified, a construction only of the gross income tax law and not the unemployment compensation law.

Were the record in a condition admitting of the exercise by this court of the powers reposed in it by Revised Laws of Hawaii 1945, section 9564, by summary order disposing of the issues, an order appropriate to our conclusions could be entered reversing the judgment and ordering judgment for defendant. But the record being as it is, and the questions involved being ones of mixed law and fact, this opinion is advisory only upon the undisputed facts disclosed by the evidence and the cause must of necessity be remanded for a new trial.[30] It is

[30] See concurring opinion of Mr. Justice Rutledge in the Silk case, supra.

so ordered.

*R. W. Loomis,* Deputy Attorney General (also on the briefs), for plaintiff in error.

*S. Kashiwa* (also on the brief) for defendant in error.