This is an appeal by the National Life Insurance Company and C. C. Wimbish, general agent for the National Life Insurance Company, from a judgment of the Superior Court affirming an order of the Unemployment Compensation Commission which, upon certain findings of fact and conclusions of law, imposed a tax of contribution on the defendant with respect to the employment of certain individuals. Upon appeal from the Unemployment Compensation Commission to the Superior Court, a jury trial was waived.
The facts in the case are succinctly stated in the opinion of the Commission and its findings of fact and conclusions of law as follows:
"FINDINGS OF FACT. That on or about the 10th day of January, 1933, the National Life Insurance Company, through its proper officers, executed a general agency contract with Mr. Chas. C. Wimbish, of Greensboro, North Carolina, effective as of the first day of February, 1933, being marked EXHIBIT 1; that in said contract the company appointed the said C. C. Wimbish General Agent with authority, powers and duties and subject to the terms and conditions and regulations, and the said General Agent accepted such appointment and employment, and agreed to develop and manage the general agency for the company and perform such duties in connection therewith as may be properly required of him; that in said contract the General Agent was authorized to employ sub-agents subject to the approval of the company and to employ such other assistants as were reasonably required to efficiently operate the general agency; the contracts with sub-agents are required to be in *Page 578 
writing and the company is entitled to be furnished copies thereof for its information at the time of the making of said contract; the contract with the General Agent further provides: `he will act exclusively for the company; he will devote his entire time and energy to the service of the company; he and his agents and employees will faithfully perform all duties pertaining to his appointment; he will endeavor in all things to promote and further the company's interest; he will work for no other life insurance company during the continuance of the contract, but nothing herein contained shall prevent him from taking an application to another company if such application shall have been first declined by the company or if the applicant is already insured by the company for the full amount carried by it on a single life at the applicant's age; he will forward all applications for insurance to the home office of the company for approval or rejection, whether the same are reported on favorably or otherwise by the local medical examiner; he will furnish to the company a bond, satisfactory to it in the sum of $5,000 conditioned upon the faithful performance of the contract and the discharge of all obligations thereunder, but the amount of the bond may be increased from time to time in the discretion of the company.
"It is further found as a fact that he is required to company with the law in force in the territory to which he is assigned in the transaction of the business of the company. He is authorized to receive money due or to become due in payment of premium, interest or other indebtedness to the company only on delivery of one of the company's insurance or annuity contracts or in exchange for the receipt of the company. He is not permitted, as General Agent, to extend credit with regard to premiums or otherwise, but if he does so on his own responsibility he will be responsible therefor and is required to account for the same as cash in his next succeeding report. All monies, securities or other property received or collected by him for the company are to be held by him as trust funds and he is required to report upon and properly transfer the same to the company in accordance with its instructions whether received by him personally or through any of his assistants, agents, partners or other persons employed or appointed by him. He is required to keep an account of the company's business according to its rules and instructions and his account must show all transactions by prompt and accurate entries.
"The Commission further finds that the said General Agent is required, as the company may prescribe, to transmit, by blanks furnished for that purpose, complete reports of all collections made and of all business done since the last preceding report and therewith to remit to the company the balance due to it at such time, day or days, of each week as the company desires. He must also furnish such other reports as the company may require and must return to the company in accordance with the company's *Page 579 
rules all policies and receipts for unpaid premiums and interest charges not delivered in accordance with its regulations.
"It is found that the company agreed that it would pay all state and local taxes, license taxes and medical fees incurred in the business. It will pay as full compensation for his services certain commissions provided for in said contracts plus all salaries beginning February 1, 1933, and ending January 31, 1935, in lieu of one-third of renewal commissions on all business written under this contract at the rate of $500 per month payable at the end of each month and the General Agent is required to devote a substantial part of his time to the development and building of the agency. In addition to certain commissions and salary aforesaid and as set forth in the contract the general agent was also to receive certain renewal commissions. Under the contract the company may require the General Agent is collect premiums on insurance written by other general agencies of the company for which no collection fee is allowed and the General Agent is not permitted to make any charge for general expenses or other services except pursuant to a written agreement between him and the company. The company agreed to pay as its share of agency expense not to exceed $300 per month plus 15% of paid first payments not in excess of $18,000 excluding premiums paid to other companies for re-insurance, single premiums not exceeding all annual premiums for the same form of insurance, term prefix premiums, and annuities. Such payments were to be continued on this basis until the first day of February, 1935, providing this contract continued in force until that time. All books, documents, vouchers, letters and all other property and papers connected with the business transacted under the agreement aforesaid is the property of the company and were to be open to inspection at all times by its officers or other representatives and in event of termination of the contract are to be turned over to the company or its duly authorized representative on demand. The territory of the General Agent is limited, as set forth in the contract herein referred to. The General Agent is authorized under the contract to establish and conduct branch offices within the territory assigned to him. This contract known as EXHIBIT 1, may be terminated by either party giving to the other thirty days notice in writing to that effect. The Commission finds that the General Agent's contract with the company was amended January 1, 1939, with reference to commission schedule as shown on the contract known as EXHIBIT 2, and again amended on the 8th day of March, 1933, as shown by Exhibit 3, said amendment provided that thereafter the General Agent became the State Agent in lieu of the title General Agent. Certain changes were made in agency expenses as provided therein and the amended contract extended the territory to the entire State of North Carolina. The original contract was again amended August *Page 580 
31, 1933, effective August 1, 1933, to provide for certain agency expenses and additional remuneration as set forth in EXHIBIT 4. It was again amended as shown by EXHIBIT 5, with reference to the agency expenses, travel, supervisory expenses and certain changes in remuneration for the General Agent and for certain advances by the General Agent to the agents as set out in EXHIBIT 5. It was again amended as to the same items by agreement dated August 29, 1936, effective as of the first day of September, 1936, and again on September 27, 1938, effective as of October 1, 1938, as shown by EXHIBITS 6 and 7 regarding remunerations, agency expense, etc.
"It is further found that EXHIBIT 8, dated the 24th day of May, being a contract between Chas. C. Wimbish of Greensboro, General Agent, and George W. Perrett of Greensboro, is a typical contract in effect in North Carolina. It provided for the employment of the agent to solicit applications for life insurance and annuity contracts in the National Life Insurance Company and to collect such premiums as may be committed to him. It is found as a fact that agents operating under contracts similar to the exhibit are required to devote their time and energy to the business by faithful performance of the duties and services in strict accordance with instructions received from time to time from the General Agent and in accordance with the rules of the company and it is agreed that they are not to engage in any other business. They must solicit effectively for policies or contracts to be issued by the National Life Insurance Company although they are not prevented from taking an application to other companies if such application is first declined by the National Life Insurance Company or if the applicant is already insured by the National Life Insurance Company for the full amount carried by it on a single life at the applicant's age. The agents are to account for all money or securities received or collected for or on account of the General Agent as trust funds and cannot use such funds for any purpose whatever, but they are required properly to report upon and transfer the same to the General Agent in accordance with his instructions. They must furnish the General Agent a bond satisfactory to him in a sum of money conditioned upon the faithful performance of their contracts and the discharge of all the obligations thereunder and the bond may be increased from time to time in the discretion of the General Agent. The agents were to receive money for and on account of the General Agent which is due or to become due in payment of premiums, interest or other indebtedness to the company, but only on delivery of one of the company's insurance or annuity contracts or in exchange for the receipt of the company. They are required to transmit at such times as may be required a complete report of all collections made and of the business done since the last succeeding report and to remit to the General *Page 581 
Agent the balance due to him. They must make any reports that are required by the General Agent and they are to receive certain commissions as provided in the contracts herein referred to for their services. The agreements with the General Agent terminate upon the termination of the general agency contract with the National Life Insurance Company. The contracts, however, provide that in case of termination of the contract between the General Agent and the National Life Insurance Company, the agents shall continue to solicit effectively for insurance contracts to be issued by the National Life Insurance Company. The agent's contracts embraced stated territories and may be terminated by either party by giving the other thirty days notice in writing to that effect.
"It is further found as a fact that C. C. Wimbish, General Agent aforesaid, is a General Agent for the Provident Life Accident Insurance Company of Chattanooga, Tennessee, in both its life, accident and health departments, General Agent for the St. Paul Mercury Indemnity Company, State Agent for the Provident Accident Insurance Company of New York, District Agent for the Provident Accident Insurance Company of New York, District Agent for the Lincoln Life Insurance Company of Fort Wayne, Indiana, Local Agent for the John Hancock Mutual Life Insurance Company, for the Connecticut Mutual Life Insurance Company, for the Pennsylvania Casualty Company, for the Dixie Fire Insurance Company, for the Globe and Rutger Life Insurance Company, for the Mercury Fire Insurance Company and the Paul Revere Fire Insurance Company, the Hartford Steam Boiler and the National Casualty Company of Detroit, Michigan; that the said C. C. Wimbish has offices in the City of Greensboro, North Carolina, in the building known and named as the Security Bank Building, upon which offices the said C. C. Wimbish pays the rent. It is further found from the evidence that the agents operating under contracts like the contract designated EXHIBIT 2 (the Perrett contract) have contracts with other companies represented by C. C. Wimbish, as General Agent, District Agent, and State Agent; that since February 1, 1938, the said C. C. Wimbish, General Agent aforesaid, has not received any salary from the National Life Insurance Company; that since February 1, 1938, he has been compensated on a percentage of premium basis; that the five employees in the office of the General Agent in Greensboro are paid by C. C. Wimbish, General Agent; that the company, except as herein stated, does not exercise any control over the said C. C. Wimbish, General Agent, as to where he shall work and when he shall work and how he shall perform his services as General Agent except in the collection of premiums and in accounting to the National Life Insurance Company of the collection made by him; that the company does, however, reserve the right to control *Page 582 
the agent as to how he shall perform his services and also reserves the right to say where he shall work and reserves the right also to require his full-time services. It is found that the agents are compensated purely on a percentage of the premiums on the business which they write and it is the only compensation they receive; that C. C. Wimbish loans them money in order to set them up in business; that the National Life Insurance Company makes certain contributions toward agency expenses out of first year premiums and renewal premiums; that some of the commissioned agents also engage in other business such as operating peanut stands and selling other forms of insurance and some of them have other incomes other than that derived from insurance sold by them for the National Life Insurance Company; that the company operates not only through a general agency system in the State of North Carolina, but also upon a district manager or district agency plan, however, the district managers or district agents enter into the same contract as the regular commission agents enter into; that such district agents or district managers operate the territory of Greensboro and vicinity, Wilmington and vicinity, Charlotte and vicinity, Leaksville and vicinity, Carthage and vicinity, and a number of other smaller towns in North Carolina; that each agent has a certain territory or district assigned to him, however, with the privilege of writing insurance anywhere in the State of North Carolina; that a small amount is provided for the office of the district manager out of which he pays his office rent and where an agent is unable to get started without some financial assistance the General Agent advances him money against his agency contract.
"The Commission further finds that all contracts with soliciting agents are between the General Agent and the Soliciting Agent, but, however, a copy of all these contracts is forwarded to the National Life Insurance Company for its information and a record of the agent is also forwarded to the Company and these agents, upon being appointed by the General Agent, are approved by the National Life Insurance Company; that the National Life Insurance Company issued a manual of instructions to its agents in January, 1935, and that the said agents are bound by the instructions as set out therein so far as the handling of the business of the National Life Insurance Company is concerned except where it is orally changed or changed by letter; that in the Charlotte, North Carolina, office, provision is made for an increased rate of commissions in order to provide for office expenses such as telephone, etc., which is listed in the name of National Life Insurance Company and the name `National Life Insurance Company' appears on the door or near the office; that where advertising is done by the district agent or district manager, the General Agent pays part and the Company pays a part and sometimes the district manager and district agent pays a part of *Page 583 
the expenses where it is done for the National Life Insurance Company; that there are approximately forty agents operating in North Carolina under contracts similar to that of Mr. Perrett; that there are a number of district or local agents who employ helpers in their offices; that the National Life Insurance Company is engaged in the life insurance business and the sale of annuities and also has an investment department with a number of employees operating in the State of North Carolina; that all notices of premiums due are sent from the home office of the National Life Insurance Company at Montpelier, Vermont, and a copy of the receipt is sent to the office of the General Agent; that any of the soliciting agents are empowered and authorized to collect and turn over the premium to the proper collection office wherever it may be whether or not they solicited and wrote the policy in the first place; these agents are permitted to accept checks payable to the National Life Insurance Company in payment of premiums and are permitted to accept cash in payment of premiums and as a part of the services to the policyholders they are asked to make collection of premiums and in case a claim is filed by a beneficiary, they usually request that they be permitted to handle the claim for the possible service it would give and for the possible business as a result of it; that the company or the General Agent does not require it, but the company or the General Agent sends the claim form to the agent to enable the agent to get the best results; that the agents are required to maintain a close contact with the policyholders and see that any National Life Insurance Company policyholders receive the finest service that it is possible for the company to grant; that the soliciting agents and general agents are engaged in the usual trade, occupation or business of the National Life Insurance Company; that some of the correspondence of the National Life Insurance Company is conducted directly with the agents who are under contract with the General Agent; that the form of contract in effect with the General Agent and soliciting agents in North Carolina is also prepared by the National Life Insurance Company; that the agents are required under the manual of instructions to devote their entire time and attention to the interests of the National Life Insurance Company unless their contracts expressly modify this feature and to refrain from work for any other person, firm, or corporation and are required to conduct it in accordance with the rules of the company as instructed to do from time to time from the home office of the General Agent; that all taxes, licenses and fees are paid by the company from the home office.
"CONCLUSIONS OF LAW
"From the foregoing findings of fact the Commission holds as a matter of law: *Page 584 
"1. That the National Life Insurance Company is engaged in employment with respect to said General Agent and said soliciting agents within the meaning of the Unemployment Compensation Law of the State of North Carolina, and has been so engaged during the calendar years 1936, 1937 and 1938.
"2. That the National Life Insurance Company of Montpelier, Vermont, is an employing unit within the meaning of the Unemployment Compensation Law of North Carolina.
"3. That the National Life Insurance Company of Montpelier, Vermont, is an employer within the meaning of the unemployment Compensation Law of North Carolina.
"4. That C. C. Wimbish, General Agent, and soliciting agents in North Carolina, operating under contracts similar to the contract of George W. Perrett, are engaged in employment and performing services for the National Life Insurance Company of Montpelier, Vermont.
"5. That with respect to said General Agent, the National Life Insurance Company of Montpelier, Vermont, has not shown to the satisfaction of the Commission the requirements of Section 19 (g) (6) (A) (B) and (C) of the Unemployment Compensation Law as follows:
"`(6) Services performed by an individual for remuneration shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commission that: (A) such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and (B) such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and (C) such individual is customarily engaged in an independently established trade, occupation, profession or business.'
"6. That the individuals operating and soliciting insurance under contracts similar to the contract of George W. Perrett, herein referred to as EXHIBIT 8, in the performance of their services under the terms of the contract and in fact do not meet the conditions set forth in section (19) (g) (A) (B) and (C) of the Unemployment Compensation Law, and the company has not shown these requirements to our satisfaction, and that the said agents are therefore engaged in employment within the meaning of said section of the Unemployment Compensation Law.
"7. That the National Life Insurance Company of Montpelier, Vermont, is accordingly liable for the payment of contributions with respect to the wages or remuneration received by said General Agent and soliciting agents and paid by the company with respect to services performed for employment under these contracts."
The Commission concludes with the following order: *Page 585 
"NOW, THEREFORE, it is ordered by the Commission that the National Life Insurance Company pay contributions required by Section 7 of the unemployment Compensation Law based upon the wages or commissions as therein defined paid to such General Agent and soliciting agents within the calendar years 1937, 1938 and 1939, and thereafter until such coverage is terminated under the provisions of the Unemployment Compensation Law of North Carolina, and make such reports as are required by said law and the regulations issued pursuant thereto.
"This the 22nd day of August, 1939.
 "UNEMPLOYMENT COMPENSATION COMMISSION OF NORTH CAROLINA, BY: C. G. POWELL, CHAIRMAN. "ATTEST: E. W. PRICE, SECRETARY."
The defendant excepted to the conclusions of law made by the Commission upon its findings of fact and to the order holding it liable for contributions for the years 1937, 1938 and 1939, with respect to the individuals mentioned in the findings of fact and requiring reports to be made as set out in the statute. The exceptions and the grounds thereof were filed in writing and, upon considering them, the Commission entered an order overruling them all. Whereupon, the defendant appealed to the Superior Court, where the conclusions of law and order of the Commission upon the facts found by them were approved. Thereupon, defendant appealed to this Court, assigning errors.
The question presented to us for decision is whether the National Life Insurance Company, the appellant, is, upon the record in the case, liable for unemployment compensation contributions demanded by the plaintiff. That question, however, is resolved into several minor inquiries which require attention.
The appellant concedes that unless the case at bar can be distinguished from Unemployment Compensation Commission v. Jefferson Standard Life Ins.Co., 215 N.C. 479, 2 S.E.2d 584, the decision of the Commission must be upheld or the cited case must be overruled before relief can be extended to it. While it contends that there are factual differences which distinguish the Jefferson Standard case from the case at bar, the main argument is addressed to the propriety of overruling that case, reviving the controversy over coverage of the act and the meaning of taxable employment within its intent. The questions presented are identical, the arguments are the same. The only difference *Page 586 
seems to be in the more formidable array of definitions and illustrations collected on the subject. These are focused on the proposition that "employer and employee" and "master and servant" are interchangeable terms, and that the Unemployment Compensation Act is confined to the strict master-servant relation, as understood at common law, in its demands for contributions.
The fact that the State has engaged in a cooperative scheme with the Federal Government does not necessarily imply strict uniformity in the incidence of the tax levied by the State and Federal laws. Conformity in that respect is not a condition of approval of the State law under Title III, section 303, of the Federal Act. The so-called "draft bills" present the minimum of requirement for such approval, but it is made clear that the several states are under no compulsion as to "just what type of legislation it desires and how it shall be drafted." In fact, under the decision of the highest Federal Court, the State was not coerced or compelled to pass any law at all, but presumably was induced to do so both because of a recognized social necessity, the offer of the Government of a gift in aid of the enterprise, and the advantage of credit on payment of the Federal taxes. Steward Machine Co. v. Davis, 301 U.S. 548; Carmichael v. SouthernOil Co., 301 U.S. 495. The Federal contribution is in the nature of a gift in aid which might as well have come from any other source of taxation and, correlatively, the employment tax collected by the Federal Government might have been expended for any other legitimate Federal purpose. Considering the social security intended to be afforded by the State and Federal laws in their joint adventure, these laws are sufficiently coordinated, provided there is within the State sufficient reciprocity between the employment upon which the tax is levied and those who receive its benefits. In the construction which the Court has given the State Unemployment Compensation Law, this balance is not disturbed.
Once having entered the field of social security of this kind, the State Legislature was not required to conform in every respect to the national ideology on the subject as expressed in the Acts of Congress.
The exhaustive opinion in Unemployment Compensation Commission v.Jefferson Standard Life Ins. Co., supra, commits this Court to the view that our Unemployment Compensation Act, which is similar to those of the majority of the states where this form of social security obtains, does not confine taxable employment to the relation of master and servant. "The scope and purpose of the present act are exceptional in breadth. The draftsmanship of the definition section, which gives flesh and sinew to the whole, shows a careful, considered and deliberate purpose to leap many legal barriers which would halt less ambitious enactments. As far as language will permit it, the act evinces a studied *Page 587 
effort to sweep beyond and to include, by re-definition, many individuals who would have been otherwise excluded from the benefits of the act by the former concepts of master and servant and principal and agent as recognized at common law." Unemployment Compensation Commission v. Jefferson StandardLife Ins. Co., supra; Industrial Commission of Colorado v. NorthwesternMutual Life Ins. Co., 88 P.2d 560; McDermott v. State, 82 P.2d 568;Globe Grain Milling Co. v. Industrial Commission, 91 P.2d 512; In reMid-American Co., 31 F. Supp. 601 (citing Jefferson Standard case,supra); National Tunnel Mines Co. v. The Industrial Commission of Utah,102 P.2d 508; In the matter of Schomp and Board of Review v. The FullerBrush Company (N. J.), 12 A.2d 702; Equitable Life Insurance Companyof Iowa v. Industrial Commission of Colorado, 95 P.2d 4.
How much wider may be its scope is a matter to be determined in the particular case.
We think it is self-evident that the Legislature, for the purpose of levying the tax, may determine what shall constitute employment subject to taxation, without regard to existing definitions or categories.Unemployment Compensation Commission v. Jefferson Standard Life Ins. Co.,supra; Industrial Commission of Colorado v. Northwestern Mutual Life Ins.Co., supra; Supply Co. v. Maxwell, 212 N.C. 624, 626, 194 S.E. 117; Foxv. Standard Oil Co., 294 U.S. 87. It may do this by direct definition or, perhaps with greater exactness, by providing a reasonable administrational procedure by which such employment may be defined or ascertained. In its opinion above cited this Court has expressed the opinion that such provision is found in the section devoted to definitions, as section 19 (g) (6) (A), (B), and (C).
This provision is not regarded as a mere method of distinguishing between the master-servant relation and independent contract, on the theory that choice must be confined to one or the other of these alternatives, but taken with the other subdivisions of the section, particularly 19 (g), as defining or circumscribing the employment with respect to which contribution is demanded. As thus ascertained, employment will include the master-servant relation and frequently more. This should occasion no surprise. It is the privilege of the Legislature, by a more particular expression of its policy than may be found in the preamble, to find room and reason for extending the relief which the law is intended to afford into this field.
On facts similar in significance to those determining the issue inUnemployment Compensation Commission v. Jefferson Standard Life Ins. Co.,supra, the application of the statutory method in the case at bar resulted in the inclusion of appellant as employer with respect to its state or general agent and the local agents appointed under the type of *Page 588 
contract exhibited in the record. We think the law was properly applied and cannot find that the Commission acted unreasonably or arbitrarily or without giving proper consideration to the evidence. There is no exception to the findings of fact.
It has not been our purpose to elaborate or enlarge on the opinion inUnemployment Compensation Commission v. Jefferson Standard Life Ins. Co.,supra, in which the Court decided the points at issue in the case at bar contrarily to the view contended for by appellant. We only restate its conclusions in view of the renewed assault. Many courts have relied on its authority and adopted its views. We see no reason to overrule a decision so carefully considered and so recently made.
2. The appellant points to certain facts in the record upon which it is thought the Jefferson Standard case, supra, should be distinguished from the case at bar, and questions its applicability. Mainly, the contention is that appellant operates under the general agency plan, while the JeffersonStandard Life Insurance Company, operates under the managerial plan, under which closer connection between the company and its agents is maintained. The difference seems to us unsubstantial in view of the facts.
The licenses of State Agents are procured or paid for by the company. The State Agent, Wimbish, under the findings of the Commission — justified as we think by the evidence — is an employee within the meaning of the statute — not an independent contractor — and his power to appoint sub-agents is referable to this relation. Such a position in the organization would scarcely serve to insulate the local agents from some measure of control on the part of the superior. Looking at the contracts and the set-up under them, and the functions performed by the local agents which render service in the production of business, there is seen a substantial line of authority reaching back to the company, with more than a suggestion of the important element of control in certain aspects of the service. Effective control over the personnel of local agencies is retained. The company approves or disapproves, as it will, of the appointment of these local agents. Also, the manner in which they conduct the business is of concern to the Insurance Company. In dealing with the public they are required to conform to the manual of instructions issued by the company. The nature of the service rendered by these agents is hardly consistent with the ordinary conception of independent contract.
Not resting decision alone upon this point, but referring to the relations which are ordinarily understood to exist between an insurance company and the public, necessarily affected by the activities and behavior of its agents, doubtless it seemed to the Commission inconsistent with the commendable restrictions in that regard appearing in the evidence that an insurance company, the nature of whose business with the public *Page 589 
involves relations of trust and confidence, should view itself as operating on the principle of independent contract — both powerless and indifferent with regard to the details of service, or the manner in which the local "agent" got the business. On the contrary, the contracts and the manner in which performance is required show that the Company had a proper conception of its duty to the public and undertook to maintain the high standard of ethical service required in discharging it by retaining adequate control over these details. Such control is evidenced with respect to these persons who have been found to be "soliciting agents and general agents engaged in the usual trade, occupation, or business of the National Life Insurance Company" without exception to the finding.
There are no exceptions to the findings of fact by the Commission. Section 6 (i); section 11 (m) (n). In our opinion, they are supported by the evidence, and the conclusions of law based thereupon are justified.
The judgment of the court below sustaining them is
Affirmed.