# IN THE MATTER OF THE APPEAL OF CENTURY METALCRAFT CORPORATION.

## NO. 3014.

ARGUED DECEMBER 11, 1956.                    DECIDED JANUARY 15, 1957.

RICE, C. J., STAINBACK AND MARUMOTO, JJ.

OPINION OF THE COURT BY MARUMOTO, J.

Century Metalcraft Corporation, hereinafter referred to as taxpayer, is engaged in the business of manufacturing and selling aluminum cooking utensils known as Guardian Service. On August 9, 1951, taxpayer was assessed $6,026.29 for additional unemployment compensation contributions due on unreported commissions of $223,196.26 paid to its house to house salesmen designated as distributors during the years 1948 through 1950. The assessment was made under Hawaii Employment Security Law (R. L. H. 1945, ch. 74), formerly known as Hawaii Unemployment Compensation Law and hereinafter referred to as the local law. Taxpayer appealed to the board of review, which

decided in its favor. The commission of labor and industrial relations, which administers the law, appealed to the tax appeal court, which affirmed the decision of the board of review. The case is before this court on appeal by the commission from the decision of the tax appeal court.

Under the law, unemployment compensation contributions are payable on wages paid with respect to employment. (R. L. H. 1945, § 4247) Wages are defined as remuneration from whatever source, including commissions and bonuses. (R. L. H. 1945, § 4211) Employment is defined as service performed for wages under any contract of hire, written or oral, express or implied. (R. L. H. 1945, § 4203)

During the period in question, taxpayer had a sales organization headed by a district manager and an assistant district manager. Under them were divisions headed by senior managers. Senior managers were assisted by junior managers. At the bottom were the distributors. Taxpayer admits that the district manager, assistant district manager, senior managers and junior managers were within the coverage of the local law. It denies that the distributors were so covered.

This appeal raises the question as to whether the distributors, to whom taxpayer paid commissions during the period in question, were in its "employment," as the term is used in the local law. In order to resolve this question, it is necessary to examine not only the formal contract between taxpayer and distributors but also the actual mode of operation of the distributors.

The formal contract is embodied in a printed form called "Distributor's Contract," prepared by taxpayer and signed by taxpayer and each distributor. The contract granted to the distributor the right to sell taxpayer's merchandise on commission. Commission was 30 percent of taxpayer's list retail price on cash sales. On deferred

payment sales, down payment of at least 20 percent of list retail price was required, and commission was 15 percent of such price, plus 11 percent of each monthly payment. Deferred payment contracts required taxpayer's approval. Initial commission of 15 percent on deferred payment sales was payable only on approved deferred payment contracts and additional commission of 11 percent of monthly payments was payable only if the distributor was actively engaged in the sales of taxpayer's merchandise when such monthly payments were made. The contract provided that taxpayer had no right to exercise any direction or control over the distributor's activities thereunder and did not prohibit the distributor from engaging in any other business or from selling the products of other manufacturers. Under the contract the distributor, for a stated rental, leased a sample kit. The sample kit remained the property of taxpayer and was returnable to taxpayer at the termination of the contract. The distributor assumed all expenses incident to the promotion and completion of sales. Title to merchandise delivered to the distributor remained vested in taxpayer until delivered to purchasers, at which time the title passed directly from taxpayer to purchasers. Initial term of the contract was one year, and thereafter from year to year. The contract was terminable by either party at any time for cause. It was silent as to sales territory and as to sales quota. It provided that all questions arising thereunder should be determined under the laws of California.

With respect to the mode of operation of the distributors, the following pattern may be reconstructed from the testimony of witnesses at the hearing before the tax appeal court.

A distributor made his first contract with taxpayer either by responding to taxpayer's advertisement in the classified column of a local newspaper or through intro-

duction by a person already connected with taxpayer, such as senior manager or junior manager. Upon his acceptance by taxpayer, he was assigned to a division or, if he knew the senior manager, he selected the division. Before going out selling on his own, he was given sales literature and received training in taxpayer's sales technique. Such technique consisted of finding "hostesses" who were willing to have demonstrations given in their homes and who were willing to invite guests to such demonstrations. Materials required for the demonstrations were provided by the distributor at his expense. After each demonstration the distributor would try to sell the merchandise to the hostess and guests, or would make arrangements for further demonstrations in the homes of some of the guests who were present. The distributor received his training in a number of ways. He might observe demonstrations conducted at taxpayer's place of business; he might attend and observe demonstrations given in the homes of hostesses by the senior manager or junior managers; or he might request the senior manager or a junior manager to assist him in demonstrations arranged by him.

Taxpayer did not provide the distributor with office space or desk. However, it took telephone calls and other messages to the distributor from prospective purchasers. The distributor printed his own business cards. His time was his own and he set his pace. Incentive was provided in the form of additional commission for sales beyond a certain volume. Also, if the distributor maintained a specified volume of sales over a certain period of time he was usually "promoted" to junior manager. As junior manager, he received overriding commission.

When taxpayer began its business in Hawaii all sales were for cash. The system of deferred payment sales came later. After the system of deferred payment sales was established, only a small fraction of sales was for cash.

Taxpayer set the list retail price of the merchandise. In the case of deferred payment sales it also set the amount of down payment and the amount of monthly payments. It had its own deferred payment contract form. The distributor was required to use this form on all deferred payment sales and he was not at liberty to change any provision therein or to reduce the amount of down payment or monthly payments. The distributor occasionally purchased the merchandise outright and sold it as his property. In such cases he set his own credit terms. Also, occasionally, he sold the merchandise at less than the list retail price by sacrificing a portion of his commission. The distributor resorted to such practices when he needed more sales to entitle him to the additional commission. Taxpayer did not recommend such practices but apparently took no step to stop them.

The distributor submitted weekly activities reports to the senior manager. Such reports contained information as to demonstrations given and sales made during the preceding week and demonstrations scheduled for the current week. Submission of such reports was not compulsory. However, the senior manager invariably obtained such reports and kept a complete record of demonstrations arranged by the distributors in his division. If any distributor was unable to attend a demonstration arranged by him, because of illness or other cause, the senior manager sent a substitute to such demonstration. If any sale was made at or as a result of such demonstration, commission on the sale was paid to the substitute. It was important for the senior manager to keep a close check on the activities of the distributors in his division because his overriding commission depended upon sales production in his division and any loss from repossession of the merchandise sold by the distributors in his division was charged against him.

There were periodic meetings of the distributors at taxpayer's office for reports and pep talks. Here again, attendance was not compulsory. But the distributor usually attended such meetings because they were beneficial and also because as a member of taxpayer's sales organization it was a prudent thing for him to do.

Taxpayer takes the position that the distributors were not in its employment because the concept of employment in employment security laws is premised upon the existence of the common-law relationship of master and servant and the distributors were not its employees but independent contractors. Whether such position is well taken depends upon the meaning and scope of the concept of employment under the local law.

Employment security laws have been enacted in all of the states, Hawaii, Alaska and the District of Columbia. The enactment of such laws was spurred by the credit provided under title IX of the Social Security Act. The Social Security Act and amendments thereto will hereinafter be referred to as the Federal law. Employment security law was originally enacted in Hawaii as Act 243 of the Session Laws of 1937. The definition of employment in the Act was identical with the present definition in section 4203 of the Revised Laws of Hawaii 1945, except that the word "remuneration" was used for "wages" and exclusions were enumerated in the same section instead of in a separate section. The original Act was completely revised by Act 219 of the Session Laws of 1939. The revision contained the definition of employment in section 4203 and, in addition thereto, the following provision:

"(5) Services performed by an individual for wages or under any contract of hire shall be deemed to be employment subject to this Act unless and until it is shown to the satisfaction of the board that,

(A) such individual has been and will continue to

be free from the control or direction over the performance of such services, both under his contract of service and in fact; and

(B) such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

(C) such individual is customarily engaged in an independently established trade, occupation, profession, or business."

This provision was contained in the draft act recommended for adoption by the Social Security Board. It was taken from the pioneer Wisconsin law. The Social Security Board in incorporating such provision in the draft act, followed the unanimous recommendation of the Committee on Legislative Affairs of the Interstate Conference of Unemployment Compensation Agencies that a definition of employment similar to that contained in the Wisconsin law be incorporated in state laws "as the basis for extending their coverage beyond the master and servant relationship." The Committee made the recommendation on the belief that the restriction of coverage to "the technical legal relationship of master and servant constitutes an obvious avenue of evading coverage by creating different legal relationships, for example, independent contractor relationship." (See, Asia, *Employment Relation: Common-Law Concept and Legislative Definition,* 55 Yale Law Journal 76, at page 83, note 21)

In some states which enacted this provision, notably Washington and Utah, early judicial decisions frustrated the legislative intent behind such enactment by limiting the coverage of the state laws to situations in which the common-law relationship of master and servant existed. (*Washington Recorder Pub. Co.* v. *Ernst,* 199 Wash. 176,

91 P. [2d] 718; *Fuller Brush Co.* v. *Industrial Commission,* 99 Utah 97, 104 P. [2d] 201)

Our legislature took positive action to prevent any such limitation by judicial decision. By Act 304 of the Session Laws of 1941 it amended the provision quoted above by inserting in the first sentence thereof the words "irrespective of whether the common-law relationship of master and servant exists." The Act also added to clause C the words "of the same nature as that involved in the contract of service." The provision as so amended is compiled in section 4207 of the Revised Laws of Hawaii 1945. It is to be noted that in the original Act the word "employee" was used but the use of the word is avoided in the subsequent revision and amendments thereof. Persons covered by the local law, presently and during the period in question, are referred to as "individuals" and not as employees. Thus, as stated in *Bailey's Bakery* v. *Tax Commissioner,* 38 Haw. 16, at page 28, "the legislature made a studied effort to avoid limitation upon the class to be benefited by rejecting standards that might restrict it exclusively to workers sustaining a master-servant relationship, as understood at common law and to include all workers whom the law was socially designed to protect."

The application of the local law, and particularly section 4207 thereof, to the facts in this case may be considered against this backdrop of legislative history.

Under section 4207 individuals who receive wages are presumed to be in employment. This presumption can be overcome only by satisfying the requirements of clauses A, B and C to the satisfaction of the commission. The burden is on taxpayer to overcome such presumption. (*Young* v. *Bureau of Unemployment Compensation,* 63 Ga. App. 130, 10 S. E. [2d] 412) The requirements of clauses A, B and C are in the conjunctive. It is not enough to satisfy one clause only. All three of the clauses must be

satisfied. (*Schomp* v. *Fuller Brush Co.*, 124 N. J. L. 487, 12 A. [2d] 702)

We are of the opinion that taxpayer has not sustained its burden as to clauses A and C. The commission concedes that taxpayer has met its burden as to clause B, and we agree. Clause B contains alternative requirements, one of which is that service be performed outside of all places of business of the enterprise for which the services are performed. The distributors performed their services outside of taxpayer's place of business.

Clause A requires taxpayer to show that the distributors were free from control or direction over the performance of their services, both under their contacts of hire and in fact. Control contemplated by this clause is general control and need not extend to all the details of the performance of service. (*Ross* v. *Cummins*, 7 Ill. [2d] 595, 131 N. E. [2d] 521) This court stated in *Bailey's Bakery* v. *Tax Commissioner, supra,* at page 32, "But in our opinion, due to the original sphere of application of the control test to the vicarious liability under the doctrine of *respondeat superior,* the rigidity of the test must yield to the objects and purposes of social insurance and the control reserved to the principal for unemployment compensation purposes need not extend to all the details of the physical performance of the service by the worker that may be essential to the master-servant relationship but may be merely a general one exercisable, directly or indirectly, over the physical activities and time surrendered by the worker."

In its contract with the distributors, taxpayer provided that it had no right to exercise any direction or control over their activities. It also provided that the distributors were not prohibited from engaging in other businesses or from selling the products of other manufacturers.

Despite this transparent attempt to avoid an appear-

ance of control, sufficient elements of control lurked in the contract itself. The provision for the termination of the contract at any time for cause without specifying the causes for which it might be terminated, basing of the amount of commission to be paid upon the list retail price set by taxpayer, dictating of the terms of deferred payment sales by taxpayer, dependence of the payment of additional commission on monthly payments on deferred payment sales upon the continuance of the distributors in the service of taxpayer, and the provision for the passing of the title to merchandise directly from taxpayer to purchasers — all these, not singly perhaps but taken together, spell control.

More elements of control appeared in the actual operation of the distributors. Although there was no contractual requirement to submit reports, we think that such requirement was in fact imposed. The activities of the distributors were under constant supervision, if not surveillance, of senior managers; senior managers were required to submit reports; this in fact made it necessary for senior managers to obtain information regularly from the distributors. Demonstrations were the concern not only of the distributors who arranged them but also of taxpayer; substitutes were dispatched if the distributors who arranged them could not attend; and commission on sales made at demonstrations attended by substitutes went to substitutes.

With reference to the provision in the contract that the distributors were not prohibited from engaging in other businesses or from selling the products of other manufacturers, the following testimony of Harry Dwyer, taxpayer's executive vice president, is significant:

"Q   And is the distributor free to sell non-competitive lines?

"A   Yes.

"Q   And how about competitive lines?

"A   He is free to do so, but we don't recommend it."
The following testimony concerning sales by distributors
at less than list retail price is also significant:

"Q   Have there been instances, Mr. Dwyer, where
the distributor sold below the stipulated down payment
under the contract?

"A   Yes.

"Q   Has the company taken any recourse against a
man under those circumstances? Have you done any-
thing about terminating his contract or penalizing
him?

"A   We warned him. We don't like our merchan-
dise sold below the published list price."

Under clause C it was incumbent upon taxpayer to
show that the distributors were customarily engaged in
independently established trade, occupation, profession or
business of the same nature as that involved in the con-
tract of service.  The showing required under the clause is
that the trade, occupation, profession or business must be
"customarily" engaged in, that it must be "independently
established" and that it must be "of the same nature as
that involved in the contract of service."

According to the record in this case, Faustino Gamboa
was the only distributor who was customarily engaged in
an independently established business during the period
in question.  But it cannot be said that he was engaged in
a business of the same nature as that involved in the con-
tract of service.  Gamboa owned a wholesale business which
dealt in Filipino food and sundries, such as slippers, hats
and garments, at wholesale.  He testified that he kept on
hand an average of $500 worth of taxpayer's merchandise,
which he sold to his customers as his property.  His gross
income tax returns do not support his statement, unless he
sold such merchandise at wholesale and not at retail.  Such
returns show retail sales of only $145.80 in 1948 and none

in 1949 and 1950. His wholesale sales were $36,444.87 in 1948; $14,127.86 in 1949; and $5,738.73 in 1950. The business involved in the contract of service of the distributors is direct retail sales of cooking utensils to ultimate consumers and not wholesale sales. Gamboa discontinued his business when he became taxpayer's assistant district manager.

Taxpayer attempted to show that some of the distributors were engaged in the business of purchasing and reselling taxpayer's merchandise. To this end Dwyer made a general statement that in many instances the distributors purchased taxpayer's merchandise outright and resold the same at the prices and on the terms fixed by them. However, the record does not contain specific instances where the distributors customarily engaged in such practice. Joe Kudama might have engaged in such practice but he was a senior manager. In instances where the distributors purchased taxpayer's merchandise outright they did so in order to get themselves into a sales production bracket which entitled them to additional commission on volume sales. This was admitted by Dwyer, who testified, "A man receives an extra, say, four percent if he ships $700 in a month's time. And if he is up to $500 it pays him to buy out an additional $200 to get the additional percentage. And then that becomes his merchandise and he has to dispose of it afterwards." Thus, such purchases were not made in the regular course of independently established businesses in which the distributors were customarily engaged.

The record in this case clearly shows that the promised land to which the distributors aspired was not the competitive world of rugged and independent businessmen but a niche in taxpayer's inner circle of senior managers and junior managers. Of such senior managers and junior managers, Dwyer testified as follows:

"Q Senior managers and junior managers are employees?

"A Are employees. We control and direct them." Seven individuals who were once distributors were witnesses at the hearing before the tax appeal court. Of them, one had attained the position of assistant district manager; one was a senior manager; three were junior managers; one did not rise above the position of distributor; as to one, Thomas Decano, another witness testified that he was a senior manager but Decano testified that he was not promoted and that was one of the reasons that he left the service of taxpayer.

*Bailey's Bakery* v. *Tax Commissioner* involved a factual situation substantially similar to this case. In that case this court held that there was a master and servant relationship within the meaning of the word "employment" as defined in section 4203 and deemed it unnecessary to determine the legal effect of section 4207. In arriving at its decision, the court relied upon the decision of the Supreme Court of the United States in *United States* v. *Silk,* 331 U. S. 704, which interpreted the coverage of the Federal law in the light of "economic reality" and rejected the test of the "technical concepts pertinent to an employer's legal relationship to third persons for acts of his servants."

An argument may be made that the rationale of *Bailey's Bakery* v. *Tax Commissioner* should be reexamined, inasmuch as Congress excluded "any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor" from the coverage of the Federal law by passing the joint resolution of June 14, 1948, known as the Gearhart Resolution. (Ch. 468, § 1 (a), 62 Stat. 438) This joint resolution was passed over presidential veto and was made retroactive to the date of

enactment of the Social Security Act. Such argument may have validity if the only provision for coverage under the local law is section 4203. However, the definition of employment in section 4203 is supplemented by section 4207. Just as the Gearhart Resolution clearly manifested Congressional disapproval of "the overzeal of the courts in trying to make a better law than the words of Congress had made," (*New Deal Cab Co.* v. *Fahs,* 174 F. [2d] 318) so just as clearly did our legislature, by Act 304 of the Session Laws of 1941, now compiled in section 4207, express its intent that under the local law coverage shall be determined "irrespective of whether the common-law relationship of master and servant exists."

Taxpayer argues that the coverage under the local law cannot be broader than the Federal law. In *Bailey's Bakery* v. *Tax Commissioner, supra,* at page 36, this court stated: "Obviously, in order that the local and Federal Acts should cover the same field and that the beneficiaries under local Acts should not exceed those contemplated by the Federal Act, the provisions of the local law could not be broader than the provisions of the federal law." Such statement was unnecessary for the decision of the case. The decision was based solely on the interpretation of section 4203, which, according to the holding of the court, did not go beyond the coverage of the Federal law as construed in *United States* v. *Silk.* The court expressly refrained from passing any opinion upon whether section 4207 enlarged the class that was covered. On the other hand, this court, in the case of *In re Yerian,* 35 Haw. 855, at page 871, stated: "The essentials of a suitable state plan of unemployment compensation are prescribed by the federal Social Security Act . . . Otherwise the provisions of the state plan are left to the discretion of the States." It further stated, at page 877: "And unless the federal Social Security Act supersedes all local legislation upon the sub-

ject of taxation for relief upon the same subjects covered by the federal Act, which it does not, all implications are neutralized by the express provision of the Hawaii Welfare Act . . ."

There is nothing in the Federal law which compels coverage under state laws to conform to the Federal coverage. (*Unemployment Compensation Commission* v. *National Life Insurance Co.*, 219 N. C. 576, 14 S. E. [2d] 689) The Federal law merely sets forth minimum standards which the states must meet in order to entitle them to the credit thereunder. States are free to exceed the Federal coverage and in fact have done so by enacting legislation broadening the concept of unemployment. Under the Federal law, the definition of state includes Hawaii.

Taxpayer calls the attention of this court to section 4208 (Q). That section was enacted by Act 304 of the Session Laws of 1941 and repealed by Act 195 of the Session Laws of 1951. It was thus in existence during the period in question. It provides that the term "employment" shall not include "any service which, pursuant to an Act of Congress enacted subsequent to April 1, 1941, is not included in 'employment' for the purposes of the tax levied by the Federal Unemployment Tax Act, so long as and whenever such service is not so included." Taxpayer argues that the type of service performed by the distributors came within the provision of section 4208 (Q) by virtue of the Gearhart Resolution.

Section 4208 (Q) purported to adopt future Federal legislation as part of the local law. There are statements in state supreme court decisions that such adoption of future Federal legislation into state employment security laws constitutes an unconstitutional delegation of legislative authority. (*Lievense* v. *Michigan Unemployment Compensation Commission*, 335 Mich. 339, 55 N. W. [2d]

857; *Cowiche Growers* v. *Bates,* 10 Wash. [2d] 585, 117 P. [2d] 624) Adoption by a territorial legislature of future Federal legislation may stand in a different category. It is stated in *Irizarry* v. *District Court of Ponce,* 64 Puerto Rico 90, at page 101, that "it might well be urged that, whatever the rule with reference to the alleged abdication of sovereignty involved in state legislation adopting by reference prospective Federal legislation, there may be no constitutional objection to action by the Legislature of Puerto Rico, the agent of Congress, in delegating back to Congress, its creator, the authority to legislate it originally received from Congress." We deem it unnecessary to decide this point, for we are of the opinion that the Gearhart Resolution is not the type of legislation covered by section 4208 (Q).

Section 4208 as enacted by Act 304 of the Session Laws of 1941, incorporated in subsection (A) through (O), specified classes of service excluded from "employment" in subdivisions (1) through (15) of section 1607 (c) of the Federal Unemployment Tax Act, as enacted by the Act of August 10, 1939. (53 Stat. 1392) Subsection (Q) was a provision for the automatic inclusion in the local law of any additional exclusions in section 1607 (c) as they were enacted by Congress from time to time after April 1, 1941. Between such date and the repeal of subsection (Q), Congress enacted the following legislation: Act of December 29, 1945 (59 Stat. 670), which added subdivision (16) excluding service performed in the employ of an international organization; Act of August 10, 1946 (60 Stat. 989), which added subdivision (17) excluding service performed in the catching and other activities connected with fish or other aquatic forms of animal and vegetable life, and Act of April 20, 1948 (62 Stat. 195), amending subdivision (15) by adding (B) excluding service performed in the sale of newspapers or magazines to ultimate

consumers under an arrangement for their sale at fixed price with compensation based on the excess of such price over the amount charged to the individual performing the service.

The Gearhart Resolution did not affect section 1607 (c). It was an amendment to section 1607 (i) which defined "employee" under the Federal law. It is concerned with the question as to when an employment relationship exists under the Federal law. Section 4208 of the local law and section 1607 (c) of the Federal law are concerned with the question of exclusions of specific classes of service in situations where the employment relationship exists.

Taxpayer presented a ruling of the Treasury Department of the United States that its distributors and individuals engaged to assist it, as to whom an inquiry was made, were not "employees" for the purposes of the Federal Unemployment Tax Act. It also presented rulings of the administrative agencies of twenty-two states to the effect that the distributors were not in "employment" under the state employment security laws. Such rulings have no probative value. In the first place, different statutory provisions may be involved. For instance, as to the Federal ruling, we have already discussed the broader coverage of the local law as opposed to the coverage under the Federal law. Also, the rulings were based on *ex parte* presentation of facts. The shortcoming of a ruling based upon such *ex parte* presentation is shown by the Pennsylvania ruling. The legal basis for the Pennsylvania ruling is the decision in *Department of Labor and Industry* v. *Aluminum Cooking Utensil Company*. (368 Pa. St. 276, 82 A. [2d] 897) The factual basis of the ruling was the assumption that "The persons engaged by the Century Metalcraft Corporation to distribute their product entered into an arrangement with the Corporation which agreement is similar to the agreement entered into by the distributors of the

Aluminum Cooking Utensil Company's product, and each Company's distributors, on the basis of the facts presented, operate in a similar manner." In *Department of Labor and Industry* v. *Aluminum Cooking Utensil Company,* the court held that not only the distributors, but junior dealers and field dealers, were not in employment. The case was submitted to the court on stipulated facts, which included the statements that the distributors might sell the merchandise at any price they desired and the company did not know the price they charged their customers; that about one-third of the distributors were engaged in other activities and lines of business; that the distributors might sell other merchandise, including that of the company's competitors, and a number of them in fact sell competitive products; that a substantial number of distributors carried a stock of merchandise, which they owned in their own right, and the distributor who did not carry such a stock was an exception; that the facts set forth in regard to the distributors were applicable to the junior dealers and field dealers; that the junior dealers and field dealers were usually chosen from the more successful distributors and received commissions on the shipments made by them and by specified groups of distributors whom they advised in regard to selling techniques. These statements have a familiar ring. They are substantially the statements that taxpayer desires this court to believe as established facts, except that in this case taxpayer does not go so far as to claim exemption for senior managers and junior managers, who stood in similar position to field dealers and junior dealers. Without elaborating any further, we think that the testimony of taxpayer's executive vice president, previously quoted, sufficiently shows that the distributors in this case were not as independent and free from control as pictured in the stipulated facts in the Pennsylvania case.

Taxpayer makes the statement in its brief that "Hawaii is the only jurisdiction in which the administrative body has ruled that the distributors of the Century Metalcraft Corporation are its employees." Taxpayer did business in at least thirty-six states. It presented rulings of the administrative agencies of twenty-two states. The ruling of the California agency is not among them. Taxpayer has its general offices in Los Angeles. The distributor's contract provided for the determination of all questions thereunder in accordance with the law of California. While the liability for unemployment compensation contributions in this case is to be determined under the local law, it may be noted that the California courts have imposed liability in cases involving facts practically identical with the facts in this case. (*Bevan* v. *California Employment Stabilization Commission,* 139 Cal. App. [2d] 668, 294 P. [2d] 524; *Sudduth* v. *California Employment Stabilization Commission,* 130 Cal. App. [2d] 304, 278 P. [2d] 946)

The decision of the tax appeal court is reversed.

*Toshimi Sodetani,* Deputy Attorney General (*Ruth W. Loomis,* Deputy Attorney General, with him on the briefs), for Commission of Labor and Industrial Relations of the Territory of Hawaii, appellant.

*Clarence Y. Shimamura* (also on the brief) for appellee.